JOHN ANTOON II, United States District Judge
Two families own and manage the apparel companies involved in this trademark infringement lawsuit. Each company sells its garments in the United States under the brand name "Spiral," and the instant action stems from the rights to use that "Spiral" name. The case is now before the Court following a bench trial, and this Order contains the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52.
I. Background and Procedural History
Plaintiffs Spiral Direct, Inc. (Spiral US), a Florida corporation established in 2013, and Spiral Direct, Ltd. (Spiral UK), a British limited liability company established in 1999 (collectively Spiral Direct), are related companies managed by brothers Sohail and Shoaib Ghayur[1] that manufacture and sell "Gothic" and "heavy metal" style clothing under the name "Spiral." Defendant Basic Sports Apparel (Basic), which is owned by Nadia Chowaiki and managed by her two sons, Hilel and David Chowaiki, manufactures and sells outdoor and athletic apparel under the brand name "Spiral."
In 1997, Basic applied to the United States Patent and Trademark Office (USPTO) for trademark registration of "Spiral" (the Basic Mark), and the USPTO granted that registration on January 19, 1999. At some point, Basic learned of Spiral Direct's use of the Basic Mark, and on January 22, 2015, Basic's attorney sent Spiral Direct a cease-and-desist letter, demanding that Spiral Direct discontinue its use of the Basic Mark and threatening litigation. Spiral Direct then filed this lawsuit against Basic on April 22, 2015.
In its First Amended Complaint, Spiral Direct alleges seven claims. It seeks a declaratory judgment: of non-infringement (Count I); that Basic's assertion of trademark infringement is barred by laches (Count II); and that Basic's trademark is invalid due to abandonment (Count III) and fraud on the USPTO (Count IV).
*1340 (First Am. Compl., Doc. 16, at 9-11). Additionally, Spiral Direct asserts several trademark infringement claims rooted in its alleged "prior use" of the Spiral mark: unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count V); unfair competition under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Count VI); and Florida common law trademark infringement (Count VII). (Id. at 12-14). Although Spiral Direct originally sought monetary relief, it withdrew any claim for monetary relief during trial. (Trial Tr. Vol. 1 at 249).[2]
In response to Spiral Direct's Amended Complaint, Basic filed four counterclaims: federal trademark infringement (Counts I and II); unfair competition under FDUTPA (Count III); and Florida common law trademark infringement and unfair competition (Count IV). (Answer Doc. 39, at 12-16) Basic sought treble monetary damages, Spiral Direct's profits, and a permanent injunction preventing Spiral Direct from using the Basic Mark. (Id. at 16-17).
Prior to trial, both sides moved for summary judgment. (Doc. 49 & 67). Spiral Direct sought judgment on all of Basic's claims under the doctrine of judicial estoppel, claiming that Basic failed to disclose this lawsuit as an asset in a prior bankruptcy proceeding. (Doc. 49). The Court granted the motion insofar as it sought to prevent Basic from recovering monetary damages against Spiral Direct but denied the motion to the extent it sought judgment on Basic's claims for injunctive relief. (Order, Doc. 99). And the Court granted Basic's motion for summary judgment on Spiral Direct's Count II-laches-but otherwise denied it. (Order, Doc. 124). The case proceeded to a four-day bench trial on the remaining issues.
II. Trial Testimony and Findings of Fact
A. Spiral Direct
In 1990, before Shoaib and Sohail created Spiral UK and Spiral US, they, along with Shoaib's brother-in-law, M.N. Alam, created Spiral Designs Partnership (Spiral Designs), which sold clothing under the name "Spiral." (Trial Tr. Vol. 1 at 25, 29-30). Spiral Designs' first trademark was typed in an oval with a stylized typeface (SD Mark). (Id. at 29-30; Ex. 1).[3] ,[4]
Spiral Designs manufactured several categories of goods, including t-shirts, long-sleeved t-shirts, hooded sweatshirts, women's garments, and accessories. (Trial Tr. Vol. 1 at 24, 27-28, 30). Before Spiral Designs began to sell its goods in the *1341 United States, from 1990 to 1993 its products consisted of t-shirts depicting photographs of musical artists-Metallica or Michael Jackson, for example-to which Spiral Designs would affix a "hangtag" bearing the SD Mark to the sewn-in neck label of the t-shirt, which bore a third-party t-shirt manufacturer's name. (Id. at 48-49). Thus, during that time, the hangtag was the only indicator that the shirt was a "Spiral" brand shirt. (Id. at 48).
By the time Spiral Designs began selling in the United States in 1993, it was creating original artwork for its t-shirts. (Id. at 160-61). Also in 1993, Spiral Designs began to import black t-shirts from Pakistan that came with sewn-in labels bearing the SD Mark. (Id. at 48-49, 113, 206). Thus, some but not all of the black t-shirts sold by Spiral Designs had sewn-in labels bearing the SD Mark in addition to hangtags. (Id. at 48-49, 100, 163). But t-shirts in other colors did not have sewn-in SD Mark labels and came only with the hangtag displaying the SD Mark. In 1995, Spiral Designs began to import a "natural" t-shirt with sewn-in tags bearing the SD Mark. (Id. at 206). Eventually, Spiral Designs imported various other products with sewn-in labels bearing the SD Mark. (Id. at 207-08).
B. Spiral Designs' Catalogs
Spiral Designs offered its products for sale through catalogs with the SD Mark displayed on the cover. (Id. at 35-37; see Exs. 50, 51, & 52). Inside the catalog, Spiral Designs offered many products-including t-shirts-in themed groupings, but none of the interior catalog pages introduced in evidence displayed the SD Mark. (See Exs. 50, 51, & 52). The title of each theme-for example, "Alienz," "Tribal," "Tupac Shakur," "Looney Tunes," "Liquid Blue," "Fantasy," or "The Simpsons"-appeared at the top of each product group page with photographs of the related products below. (See id. ). Every other page had Spiral Designs' website address, www.spiral-net.com, at the bottom. (See Ex. 52).
Between 1993 and 1999, the products offered in the Spiral Designs catalog fell into three categories. The first category consisted of garments that depicted original artwork created by Spiral Designs. (Trial Tr. Vol. 1 at 160-61). A "majority" of black t-shirts in this category came with sewn-in labels depicting the SD Mark. (Id. at 163). Sometimes when Spiral Designs ran out of sizes and had to purchase wholesale shirts from third-party manufacturers, black t-shirts did not come with the sewn-in label bearing the SD Mark. (Id. ). The second category was comprised of garments with original Spiral Designs designs licensed from third-party companies, (Id. at 210). For example, third-party brands like Route 66, Tupac Shakur, and Atmosfear would grant Spiral Designs an exclusive license to create original designs that, after approval of the licensor, could be sold by Spiral Designs. (Id. at 160-61, 210). Again, only some shirts under the second category had sewn-in tags bearing the SD Mark because some licensors-like Route 66-did not allow Spiral Designs to attach its own labels. (Id. at 167). The third category was made up of resold third-party products. (Id. at 84-85). This category included products from brands like The Simpsons, South Park, and Looney Tunes. (Id. ). None of the garments in this category came with sewn-in tags depicting the SD Mark.
But all three categories came with hangtags that displayed the SD Mark, (id. at 29-30, 47-48, 211), and all goods sold by Spiral Designs-whether original designs or merely resold third-party goods-were packaged in plastic bags with the SD Mark. (Id. at 34). Sohail estimated that ninety percent of Spiral Designs' sales between 1993 and 1997 were of designs created by Spiral Designs. (Id. at 163-64).
*1342 C. Spiral Designs' Sales in the United States
In 1993, Spiral Designs began advertising its products in magazines, 50,000 copies of which were circulated in the United States. (Id. at 34-35). Also in 1993, Spiral Designs began sending mail-order catalogs to people who responded to its magazine ads. (Id. at 35). And by 1994, Spiral Designs had begun to make sales in the United States through its mail-order catalogs. (Id. at 34).
Shoaib provided many estimates as to the number of catalogs Spiral Designs sent to the United States and how many sales Spiral Designs made from that catalog distribution. (Id. at 78-79, 80-82, 136-37; 147-48). In 1993, Spiral Designs sent approximately 250 catalogs to individuals in the United States. (Id. at 35). In 1997, that number increased to 2,000; in 1999, 10,000 catalogs were sent. (Id. at 37, 58-59). Shoaib testified that Spiral Designs made 5-10% of its sales from the catalogs it distributed in the United States in 1993 and 1997 and 10-15% in 1999. (Id. at 37, 60). Thus, according to Shoaib's estimates, Spiral Designs made roughly 12 to 25 sales from the 250 catalogs it distributed in 1993; about 100 to 200 sales from the 2,000 catalogs in 1997; and about 1,000 to 1,500 sales from the 10,000 catalogs in 1999. However, Shoaib's testimony as to catalog sales was tenuous. His estimates were not consistent throughout his trial testimony, nor were they consistent with his deposition testimony. (Id. at 79-82). On cross-examination, Shoaib could not recall the percentages he stated during his direct testimony or state a basis for his percentage estimates other than that they were "guesses." (Id. at 79-82, 136-37).
In 1994, Spiral Designs started a retail website that displayed the SD Mark and contained an online version of its catalog where customers could order its goods. (Id. at 43; Ex. 2). The same year, Spiral Designs began making sales through the website, but neither Shoaib nor Sohail offered estimates of website-generated sales. However, Spiral Direct produced records of Spiral Designs' total revenue from 1996 and 1997, which showed that its total revenue in 1996 was £ 793,283-of which Shoaib testified 5-10% was attributable to sales made in the United States. (Trial Tr. Vol. 1 at 41-42; Ex. 61 at 3). Spiral Designs' total revenue in 1997 was £ 535,800-of which Shoaib testified 15% was attributable to sales made in the United States. (Trial Tr. Vol. 1 at 42; Ex. 61 at 3).
Spiral Direct was unable to produce Spiral Designs' full sales records from 1993 to 1997 because either much of the data was not carried over when Spiral Designs began to use new accounting software or the data was otherwise purged in the regular course of business. (Trial Tr. Vol. 1 at 168-73). But Sohail was able to recover some of Spiral Designs' sales data from mail-order catalogs from 1996 and 1997. (Id. at 213; see Ex. 169). The sales data show twenty-three invoices for sales inside the United States between 1996 and 1997. (Exs. 169 & 72). The total amount of these sales combined was at least £ 481.14. (Ex. 169). Those sales were made in twelve states: 6 in California; 3 in Florida; 2 in Virginia, Ohio, Illinois, and Pennsylvania; and 1 in Texas, Minnesota, North Dakota, Georgia, New Hampshire, and New York. (Ex. 73). Sohail stated that the computer records showed that by 2002, Spiral Designs sent catalogs or sold product in all fifty states but that its full records-which were unavailable-would show that Spiral Designs sent catalogs or sold items in all fifty states before 2002. (Trial Tr. Vol. 1 at 211)
Additionally, Spiral Direct produced a data table of Spiral Designs' yearly revenue from sales in the United States from 1998 through 2016. (Ex. 66 at 1). Separated *1343 into two columns-one for revenue earned in British pounds and another for revenue earned in U.S. dollars-the table shows that Spiral Designs made no sales in the United States from 1993 to 1997. (Id. ). According to Sohail, that did not mean that Spiral Designs did not make sales for those years but rather that it was unable to produce records of sales during that time. (Trial Tr. Vol. 1 at 213). Sohail testified the earlier years in the chart inaccurately portrayed only a fraction of Spiral Designs' total sales in the United States. (Id. ).
The same table showed that in 1998, Spiral Designs' reported revenue for sales in the United States had increased to £ 245.85. (Ex. 66 at 1). And by 1999, that revenue was £ 1,326.54. (Id.). U.S. sales increased throughout the next several years with notable exceptions in 2005 ($ 732.44) and 2006 (£ 110.17). (Id. ). In 2016-the last year for which data is available-Spiral Direct's revenue from sales in the United States was £112,341.00, the equivalent of $121,284.10. (Id. ).
Based on Shoaib's unrebutted testimony about the number of catalogs Spiral Designs sent between 1993 and 1999, the Court finds that Spiral Designs sent to the United States: 250 catalogs in 1993; 2,000 catalogs in 1997; and 10,000 catalogs in 1999. However, due to Shoaib's wavering testimony regarding the number of Spiral Designs' United States sales as a percentage of the catalogs distributed, the Court credits only his lower-end estimates. Specifically, the Court finds that Spiral Direct made: 12 sales in 1993; 100 sales in 1997; and 1,000 sales in 1999. The Court also finds that Shoaib's estimates regarding Spiral Designs' revenue from sales in the United States for 1996 and 1997 as a percentage of Spiral Designs' overall revenue are unreliable and contradicted by his own estimates of the number of sales Spiral Designs made in the United States. But Sohail's testimony that ninety percent of the goods Spiral Designs sent into the United States were original designs-and not third-party goods-was credible. Sohail's testimony was also credible regarding the reasons Spiral Direct was unable to produce its full sales data from 1993 to 1999. Based on the data Sohail was able to recover, together with Shoaib's estimates of Spiral Designs' sales in the United States, the Court finds that Spiral Designs' revenue from its sales in the United States was greater than the amounts listed in its revenue exhibit. (Ex. 66). However, the Court is unable to make specific findings of revenue based on the evidence in the record.
D. Partnership Voluntary Arrangement
On April 28, 1999, after one of Spiral Designs' business arrangements went awry, Spiral Designs' partners-Sohail, Shoaib, and M.N. Alam-entered into a "Proposal for a Partnership Voluntary Arrangement" (PVA) that allowed Spiral Designs to restructure its debt and pay its creditors over time. (Trial Tr. Vol. 1 at 51-52; Ex. 63). According to the PVA, Spiral UK, which was incorporated on February 15, 1999, (Ex. 26 at 1), purchased Spiral Designs' assets. The PVA states:
The assets of Spiral Designs comprise four licences [sic], stock and office equipment, and book debts. The debts are factored and there is a shortfall to the factoring company. The partners were aware that on the insolvency of the partnership the licences [sic] would be terminated. Therefore the licences [sic] are being transferred to Spiral Direct Limited. The assets of the partnership have recently been sold to Spiral Direct Limited for £ 46,825. Spiral Designs will retain ownership of the assets until paid for in full.
(Ex. 63 at 3). Additionally, the PVA stated that Spiral UK "has purchased the goodwill *1344 and customer base of Spiral Designs for the sum of £ 1." (14 at 4). According to Shoaib, the £ 1 sale occurred before the parties entered into the PVA. (Trial Tr. Vol. 1 at 53). Shoaib characterized this purchase as including Spiral Designs' trademarks, designs, and Inventory. (Id. at 52-53). Under the PVA, Spiral Designs became dormant and Spiral UK began to make monthly payments to Spiral Designs' creditors. (Id. at 54). Throughout the period of time in which Spiral Designs' creditors were being paid, Spiral UK was using the SD Mark and continued the business of selling goods to Spiral Designs' customers. (Id. at 53). On March 29, 2004, Spiral UK finished paying Spiral Designs' creditors. (Ex. 62 at 2).
In 2008, Spiral Direct applied for a trademark registration in the United States for the SD Mark but the USPTO issued a refusal to register the mark, in part because there was a likelihood of confusion with the Basic Mark, which was registered in 1999. (Trial Tr. Vol. 1 at 62, 139-40; Ex. 168). Spiral Direct continues to sell its goods through mail-order catalogs, its own website, Amazon.com, and Ebay.com. (Trial Tr. Vol. 3 at 8).
E. Basic
Hilel created Basic in 1992, and David joined the business in 1993. (Trial Tr. Vol. 3 at 103). For several years, Basic only manufactured third-party, "private-label goods"-that is, clothing for wholesale customers who, in turn, sold the garments under their own brand names. (Id. at 185-86). The private-label customers were familiar brands like Eddie Bauer, L.L. Bean, The North Face, and REI. (Id. at 188, 200).
The process of manufacturing private-label goods begins with Basic buying raw materials from countries around the world and shipping those raw materials to its factory in Ciudad Juarez, Mexico. (Id. at 186-89). Once the garments are completed, they are sent to Basic's warehouse in El Paso, Texas, where Basic stores the goods until they are distributed. (Id. at 189, 200-01). By 1997, Basic's annual revenue from private-label sales was $3 million. (Id. at 193).
By 1997, Basic had a large number of excess or "overrun" garments left over from its wholesale customers' orders, (Id. at 191-92). Starting sometime in the spring or summer of 1997, Basic removed the labels from its overrun goods and replaced them with its own mark depicting a large letter "S" and the word "Spiral" to sell directly to retail customers. (Trial Tr. Vol. 2 at 114; Trial Tr. Vol. 3 at 161-62, 196).
(Ex. 7 at 14) About three percent of the goods manufactured for third parties were "overrun goods" that were relabeled with the Basic Mark. (Trial Tr. Vol. 2 at 134-35; Trial Tr. Vol. 3 at 193). Basic also manufactured some goods for its Spiral brand from new fabric. (Trial Tr. Vol. 2 at 177-79;
*1345 Trial Tr. Vol. 3 at 165-66, 200; Trial Tr. Vol. 4 at 6).
On April 8, 1997, Basic performed a trademark search for users of the "Spiral" mark, but the search did not reveal Spiral Designs' use of the mark. (Trial Tr. Vol. 2 at 193; Trial Tr. Vol. 3 at 197-98; Ex. 102). On September 17, 1997, Basic filed an application with the USPTO for a trademark registration for use of the word "Spiral" on "[j]ackets, pullovers, hats, jeans, T-shirts, vests, shorts, underwear, shoes, ... socks, gloves, headbands and scarves" (Basic Goods).[5] (Ex. 6 at 1). The application stated that the basis for registration was that Basic was "using the mark in commerce on or in connection with the above-identified goods." (Id. at 2). The application stated that Basic first used the mark in interstate commerce on June 15, 1997. (Id. ). David signed the application and attested in his attached declaration that "the facts set forth in this application are true[ ] and that all statements made of [David's] own knowledge are true and all statements made on information and belief are believed to be true." (Id. at 3-4). On January 19, 1999, the USPTO issued Basic a registration-number 2,218,515-of the Basic Mark for use on the goods listed in its application. (Ex. 8 at 1).
Between 1997 and 2016, Basic sold Basic Goods under the Basic Mark through several brick-and-mortar retail stores operated by Nadia. (Trial Tr. Vol. 2 at 19, 173-74; Trial Tr. Vol. 3 at 103). Basic's first retail store, called "Spiral," opened on November 1, 1997, and was located at 900 North Michigan Avenue in Chicago, Illinois. (Trial Tr. Vol. 2 at 26; Ex. 18 at 3).
F. Basic's Sale of Spiral Goods Before its Application for Trademark Registration
As discussed at length in the conclusions of law section, infra, the relevant question in determining whether a trademark must be cancelled for fraud on the USPTO based on lack of use of a particular good is whether the good was sold in commerce before the trademark application was filed with the USPTO. See Angel Flight of Ga., Inc., v. Angel Flight Am., Inc., 522 F.3d 1200, 1210 (11th Cir. 2008). Although Basic stated in its September 1997 registration application that it began using the Basic Mark in commerce on June 15, 1997, Spiral Direct contests that assertion and maintains that Basic did not use the Basic Mark in commerce until it opened the Michigan Avenue store in November 1997. Each of the Chowaikis testified on this issue at trial.
1. Nadia Chowaiki's Testimony
Nadia was the first member of the Chowaiki family who was called to testify in Spiral Direct's case-in-chief. Early in her testimony, Spiral Direct's counsel began inquiring about the date that Basic first sold slippers. (Trial Tr. Vol. 2 at 24-26). With each question posed by Spiral Direct's counsel to Nadia, David-who was sitting and leaning forward at counsel's table-was nodding his head in the affirmative or shaking his head in the negative. The Court noticed immediately when David began making these not-so-subtle movements, which were in plain view of everyone in the courtroom, including Nadia, who was on the witness stand about fifteen feet away from Basic's counsel table. When Spiral Direct's counsel asked Nadia whether she had personal knowledge of selling slippers before Basic *1346 opened its first retail store on Michigan Avenue, Nadia answered, "Not me. I start in the store." (Id. at 26-27). Then, after David's head gesture, Nadia immediately recalled that she sold slippers to her sister's friends in Chicago before the store opened. (Id. at 27). It is clear from the transcript when Nadia responded to David's gesture:
Q Prior to the opening of that store in Chicago, did Basic Sports Apparel sell any slippers?
A Yes.
Q Okay. Describe how.
A I mean, I was not involved in-
Q Let me ask you this question: Do you have any firsthand knowledge of Basic Sports Apparel selling any slipper prior to the opening in November 1997 of that Chicago store?
A Yes.
Q You have firsthand knowledge?
A Yeah, but-
Q Describe for us what firsthand knowledge you have, and to be clear, when I say "firsthand knowledge," I'm not saying something that somebody else told you. I'm saying you actually either did it yourself or you saw it.
A Not me. I start in the store.
Q Okay. So you started your work selling Basic Sports Apparel goods in the store?
A Yes.
Q And the store didn't open until November of 1997?
A I sold some now that I recall. My sister lived in Chicago. So I sold a lot to her friends before because I was showing them if they like the product before I entered the store, and they bought some, you know, products from me.
(Id. at 26-27 (emphasis added) ). The Court, after noticing Nadia's responsiveness to David's head movements, admonished David for signaling answers:
THE COURT: Let me take-let me interrupt you for a minute.
MR. CANNELLA: Yes, sir.
THE COURT: When the witness is on the witness stand, it's the witness'[s] answers and the witness'[s] answers only that are called for. Anything else is inappropriate. And if other people signal to the witness what answer to give, that is a serious matter that require-will require court action. Now, what's happening here is the-particularly with regard to Mr. David Chowaiki, he is responding to the questions himself with a shake of the head or a nod of the head. That will not be tolerated. I'm not suggesting that it is a deliberate effort to signal the response to the witness, but it has that effect. So maybe if you sit back in the chair and just relax, it won't come automatically. You may proceed.
(Id. at 27-28).[6] Immediately thereafter, *1347 Nadia abandoned the story that she had previously sold products to her sister's friends in Chicago. In a confusing back-and-forth between Spiral Direct's counsel and Nadia, she admitted that she never made such a sale:
Q Ms. Chowaiki, you told me that at the beginning that you are responsible for managing the retail stores, correct?
A Yeah.
Q And the first retail store was in Chicago?
A Yes.
Q And that first retail store opened in November of 1997?
A Yes.
Q Okay. And you also told me that the slippers were sold in the retail store?
A Yes.
Q And I asked you if you had any firsthand knowledge of sales of any slippers, and you started to tell me about your sister lived in Chicago, and she had some friends-
A Yeah, okay.
Q So I'm-
A It's okay.
Q I'm confused. Were those-were those retail transactions?
A Where?
Q With your sister and her friends where, you know, you showed them some slippers?
A No, no slippers for them.
Q Okay. So they didn't get any slippers?
A No, not from me.
Q No slippers for them?
A Yes.
Q So the first slipper that you would have sold in commerce would have been at the retail store-
A Yes, yes.
Q I'm sorry. If you could, just let me finish the question, and I'll try to-I'll extend the same courtesy to you and let you finish the answer.
A Okay. Yeah.
Q Okay. So the first slipper that you sold in commerce would have been at the retail store, which did not open until November of 1997. Is that correct-
A Yes, yes.
Q All right. And prior-so that means prior to November of 1997, you didn't sell any slippers?
A No, not me.
Q And do you have firsthand knowledge of anyone-by firsthand, I mean it's not something somebody told you, but do you have firsthand knowledge of anyone selling a Basic Sports Apparel slipper prior to November of 1997?
A Not really.
(Id. at 28-30). Later, Nadia again testified that she "maybe [sold] a few little things to ... the neighbors of my sister[ ]." (Id. at 63).
Nadia also testified that in the summer of 1997-before the Michigan Avenue retail store opened-Basic operated a retail store in the corner of its El Paso, Texas warehouse. (Id. at 49-50, 52). Nadia described one sale in particular that she observed when she visited the warehouse in the summer of 1997. (Id. at 51). She specifically recalled that during her visit a delivery driver bought one or more of every item listed in Basic's trademark application for the driver's son, who was going to attend a university in Minneapolis. (Id. ). From memory, Nadia recalled that the driver bought two or three jackets, long underwear, khakis, a hat, two headbands, scarves, vests, pullovers, boxers, fleece pants, gloves, socks, slippers, a long-sleeve t-shirt, and shorts.[7] (Id. at 51-57).
*1348 Throughout the remainder of her testimony, however, Nadia mentioned three times that it was difficult for her to remember details from many years ago and that she often confused dates: "I'm mixing the years now. I don't-I don't know what you're-I don't remember very well the years," (id. at 43); "You know, I cannot recall really very well, and you want me in 20 years to tell you what every detail, you know," (id. at 63); "[Y]ou know, for me dates and months and this, they're very difficult for me to remember, you know, details," (id. at 69).
Based on Nadia's inconsistent and contradictory testimony, the Court finds that her testimony regarding sales made before Basic filed its trademark application in September 1997 was not credible.[8]
2. David's and Hilel's Testimony
David and Hilel testified that Basic sold all the goods listed in its trademark application from Basic's El Paso, Texas warehouse before filing the application in September 1997. (Id. at 113-123; Trial Tr. Vol. 3 at 189-90; Trial Tr. Vol. 4 at 9, 12-13). Specifically, they described that a 1,000 to 1,250 square-foot section of Basic's El Paso warehouse operated as a retail store where customers could purchase Basic Goods. (Trial Tr. Vol. 2 at 127). They explained that the retail space in the warehouse had ten to fifteen racks of clothing and several baskets and tables that displayed accessories. (Id. at 185; Trial Tr. Vol. 3 at 189; Trial Tr. Vol. 4 at 135). David estimated that in the summer of 1997 Basic sold 50 to 100 Basic Goods out of the warehouse. (Trial Tr. Vol. 2 at 119, 126). David further stated that Basic shipped 25 to 30 orders to customers outside of Texas, but he only produced mailing receipts dating back to 1999. (Id. at 128; Trial Tr. Vol. 4 at 136-38).
Basic produced no photographs of the retail section of the warehouse and no documentary evidence of any sales before September 1997 because Basic's computer systems did not track its inventory or produce itemized receipts. (Trial Tr. Vol. 2 at 22-23, 120-121, 130; Trial Tr. Vol. 3 at 107; Trial Tr. Vol. 4 at 19-20, 91, 154-55). David testified that Basic continues to operate a retail section in its current warehouse. (Trial Tr. Vol. 2 at 157; Trial Tr. Vol. 4 at 139).
Hilel testified that in the summer of 1997 he once packed his car with 50 to 100 Basic Goods-including all items listed in the trademark registration-to sell to rock climbers in New Mexico who had placed orders with him. (Trial Tr. Vol. 4 at 10-11). Hilel additionally recounted an instance where he sold Basic Goods to a couple while he was on a bike tour in France. (Id. at 14-15). He specifically remembered that the couple lived in Boston, Massachusetts, *1349 and owned a large liquor store. (Id. at 14). Hilel further recalled that Todd Skinner, "the Michael Jordan of rock climbing," came to the warehouse on multiple occasions to buy large amounts of Basic Goods. (Id. at 12-13).
During cross-examination, Spiral Direct's counsel challenged David's and Hilel's credibility by introducing declarations that they filed in a previous trademark infringement case. (Exs. 7 & 25). In that case, a shoe company called Spira Footwear, Inc. sued Basic and alleged in a motion for summary judgment that Basic "committ[ed] fraud against the USPTO for knowingly submitting a trademark request on an undeveloped product." Spira Footwear, Inc., v. Basic Sports Apparel, Inc., 545 F.Supp.2d 591, 594 (W.D. Tex. 2008). Specifically, Spira Footwear contended that Basic never sold a shoe despite representations that it had done so in its trademark application and subsequent declarations to the USPTO.[9] Id. ; see Spira Footwear, Inc.'s Mot. Summ. J., Doc. 26 at 12 in Case No. 3:07-cv-129 (W.D. Tex.) ("In this case, on three separate occasions, Defendant [Basic] represented to the [USPTO] that it had sold 'shoes' using the trademark 'Spiral'...."); id. ("Defendant has NO documents to support any contention that it has at any point ordered material for shoes, delivered shoe material to its maquiladora plant, assembled material into a shoe, brought an assembled shoe back into the United States, or sold a shoe to anyone.").[10]
In support of Basic's position that it manufactured shoes and sold them before it filed its trademark application, Hilel and David submitted sworn declarations in the Spira Footwear case on December 21, 2007. (Exs. 7 & 25). Hilel's declaration stated in pertinent part:
15. The first store location where SPIRAL brand products were sold was located at 900 N. Michigan Avenue in Chicago, and that store opened in 1997.
....
18. Other store locations where the SPIRAL brand products were sold by [Basic] in the years since 1997 and through 2007 include: Oakbrook Mall, Oakbrook, IL, Fox Valley Mall, Aurora, IL, Woodfield Mall, Schaumburg, IL, Sunland Park Mall, El Paso, TX, Grapevine Mills Mall, Grapevine, TX, The Galleria, Houston, TX, St. Louis Mills Mall, Hazelwood, MO, Colorado Mills Mall, Lakewood, CO. These store locations were managed on site by either Nadia Chowaiki or David Chowaiki.
....
20. At each store location, including at the original store at 900 N. Michigan Avenue, there were numerous displays identifying and promoting the SPIRAL brand name as the brand of the finished product.
*1350 ....
23. To stock the SPIRAL stores, we simply loaded a truck with a large volume of clothing articles from our storage warehouse and sent it to the retail location where it was to be sold.
....
25. Similarly, at the store receiving end, since all of the clothing articles were coming from the [Basic] warehouse, and all were to be put up for sale at the retail location, no written records were made of how many of each type of product were being received, or how many of each product were being sold.
....
28. As the inventory in a store was sold, telephone calls were placed from the store locations to the factory/warehouse location with a request that more products be sent to the store for sale.
....
43. All of the SPIRAL brand products were simply placed into their own area in the warehouse until it was time to send a shipment of articles to a retail store for sale.
44. I have personally seen the cut fabric pieces for the slipper shoes.
45. I have personally seen the assembled slipper shoes move into inventory at the [Basic] factory warehouse.
46. I have personally seen the slipper shoes loaded for shipment to the retail stores.
47. I have personally seen the slipper shoes displayed for sale in various of the retail stores that I have visited ....
(Ex. 25). David's declaration contained many of the same statements, with the addition of the following:
2. In 1997, since we had a large supply of clothing articles on hand and in storage that were not needed by our wholesale customers, [Basic] decided to launch its own brand of clothing under the brand name SPIRAL which we sold through stores that we owned and operated ourselves.
3. I have been the on-site manager for several of the SPIRAL stores owned by [Basic] since 1997 ....
4. Beginning in 1997, with the opening of the Spiral store at 900 N. Michigan Avenue, I have worked at several different SPIRAL stores, including: Oakbrook Mall, Oakbrook, IL, Fox Valley Mall, Aurora, IL, Woodfield Mall, Schaumburg, IL, Sunland Park Mall, El Paso, TX, and The Galleria, Houston, TX.
5. In each of the Spiral stores where I worked, I personally sold each of the clothing items listed in the trademark registration of SPIRAL, namely, jackets, pullovers, hats, jeans, T-shirts, vests, shorts, underwear, shoes, socks, gloves, headbands and scarves.
6. To stock the SPIRAL stores, we simply loaded a truck with a large volume of clothing articles from our storage warehouse and sent it to the retail location where the clothing was to be sold.
....
11. At each store location, including at the original store at 900 N. Michigan Avenue, there were numerous displays identifying and promoting the SPIRAL brand name as the brand of the clothing products we were selling.
....
24. The declaration that I signed on September 10, 1997 ... was true and correct in that I had been involved in setting up the store at 900 N. Michigan Avenue in Chicago with all of the items listed as being sold in association with the SPIRAL mark by the time I signed that declaration.
(Ex. 7).
It is clear that David and Hilel submitted their declarations in part to establish that Basic sold slippers before filing its *1351 trademark application. See Basic's Resp. to Mot. Summ. J., Doc. 29 at 6 in Case No. 3:07-cv-129 (W.D. Tex.) ("In both the depositions and in the current declarations, each of these witnesses confirms that the slippers (and all of the other listed goods) were made and sold by [Basic] in connection with the SPIRAL trademark since prior to the filing of the trademark application , and every year since that time." (emphasis added) (citing David and Hilel's declarations) ). However, at no point in their Spira Footwear declarations did David or Hilel mention that Basic operated a store within its warehouse or that they sold Spiral goods out of the warehouse. On the contrary, they referred to the warehouse as a place for storing inventory and called it a "storage warehouse." The declarations further fail to mention that Hilel made sales to members of the rock climbing community in New Mexico, that he sold Spiral goods to a couple in France, or that Basic shipped its Spiral products directly to customers from the warehouse. Most significantly, nowhere in their declarations did David or Hilel notify the Spira Footwear court that the Michigan Avenue store did not open until November 1, 1997-after Basic had filed its trademark application.[11]
Paragraph 24 of David's declaration is particularly troubling. It states that the trademark application was "true and correct" because David "had been involved in setting up the store at 900 N. Michigan Avenue in Chicago with all of the items listed as being sold in association with the SPIRAL mark by the time [he] signed the [September 10, 1997] declaration." (Ex. 7 ¶ 24). However, because the Michigan Avenue store did not open until November 1997-after the trademark application was filed-any "setting up" of that store was either impossible (because Basic's lease term had not yet started) or completely irrelevant to the issue whether Basic was selling its goods in commerce. David acknowledged at trial that he understood "in commerce" to mean "going across state lines or across the country lines." (Trial Tr. Vol. 2 at 96).
David's explanation at trial for paragraph 24 was puzzling: "[Paragraph 24] doesn't say that I was selling from the 900 Michigan store. I mean, I was setting up. It takes months to set up a store. But I had already sold all the items from the warehouse." (Id. at 104-05). But this does not account for why David volunteered in his declaration that he was "setting up" the Michigan Avenue store in the same breath as stating that Basic had sold all of the Basic Goods in commerce before it filed the trademark application. If Basic had truly been operating a store out of its warehouse and making numerous sales across state lines, David's declaration would have read something like: The declaration that I signed on September 10, 1997, was true and correct in that I had sold out of Basic's warehouse located in El Paso, Texas, all of the items listed as being sold in association with the SPIRAL mark by the time I signed that declaration. But it did not. The declarations of David and Hilel in the Spira Footwear case are contradictory to the testimony each offered at trial in this case.
Based on David's and Hilel's inconsistent and contradictory statements, their complete lack of documentary evidence of sales before September 1997, and David's lack of candor with the Spira Footwear *1352 court regarding the opening date of the Michigan Avenue store, the Court finds that David's and Hilel's testimony regarding sales made before September 17, 1997, is not credible and will be accorded no weight.
3. Basic's Advertising in 1997
With regard to Basic's methods of advertising before it filed its trademark application, Hilel and David each testified that Basic advertised through word of mouth and by passing out flyers. (Trial Tr. Vol. 2 at 114-15, 117-18, 120; Trial Tr. Vol. 4 at 9). But David answered differently when his own counsel asked a more pointed question:
Q: ... During your direct testimony, you indicated that Basic Sports Apparel had done some marketing during the spring and summer of 1997?
A: Yes.
Q: Do you recall any event during that period of time before the trademark filing when Basic Sports sponsored anything?
A: There was a rock-climbing event that-that we had sponsored.
Q: Were you present for that?
A: Yes.
Q: Can you describe how Basic Sports sponsored it and what it did.
A: I mean, we took fl[y]ers. We took some-some product. We put it for display. And we sold some. And we-we were basically-a lot of the rock-climbing community that was there at the time.
(Trial Tr. Vol. 2 at 175-76). Additionally, Hilel testified that the rock-climbing event was a competition and Basic gave Basic Goods to the winners of the event. (Trial Tr. Vol. 4 at 9). However, in two earlier trademark infringement cases in 2007 and 2014, Hilel stated in his depositions that Basic only advertised through flyers and word of mouth. (Trial Tr. Vol. 4 at 107-08; Ex. 108 at 142-144; Ex. 104 at 38-41, 110-12). Indeed, even in Hilel's deposition in this case, when asked about the type of advertising that would encourage customers to visit Basic's warehouse, Hilel answered "word of mouth."[12] (Trial Tr. Vol. 4 at 108). Additionally, in a declaration submitted in this case Hilel stated that "[w]e primarily marketed in our local area using fl[y]ers and word of mouth." (Doc. 67-12 ¶ 15). Although Basic was a relatively large and sophisticated business and David and Hilel were diversified, successful businessmen, Basic failed to preserve copies of the flyers it says it circulated.
Based on David's and Hilel's inconsistent statements, the Court finds that David's and Hilel's testimony that Basic sponsored a rock-climbing event before it filed its trademark application in September 1997 is not credible.
G. Sale of Basic Goods from 1997 to 2007
1. Operation of "Spiral" Stores
Basic's first retail store opened on November 1, 1997, and operated for three and *1353 a half years under the name "Spiral." (Trial Tr. Vol. 2 at 91, 102-03). Thereafter, Basic operated numerous stores under the name "Spiral" between 1997 and 2007, many of which were operated seasonally and managed by Nadia and David. (Trial Tr. Vol. 2 at 91-92; Trial Tr. Vol. 3 at 103; Trial Tr. Vol. 4 at 15; Ex. 110 at 5). Nadia testified that starting at the Michigan Avenue store, Basic sold all of the Basic Goods listed in the trademark registration: jackets, pullovers, vests, pants, khaki jeans, long underwear, boxers, shorts, hats, headbands, gloves, scarves, slippers, t-shirts, and socks. (Trial Tr. Vol. 2 at 30-31; Trial Tr. Vol. 3 at 105-06). She testified that all of these garments, with the exception of slippers, came with sewn-in tags depicting the Basic Mark. (Trial Tr. Vol. 2 at 24-26, 33, 58; Trial Tr. Vol. 3 at 106). Nadia also stated that these items came with attached hangtags depicting the Basic Mark. (Trial Tr. Vol. 3 at 106). She also testified that slippers, socks, gloves, and other accessories were sold in baskets or on display tables with hangtags that displayed the Basic Mark, and they were placed in proximity to signs that displayed the Basic Mark. (Trial Tr. Vol. 2 at 59, 88-89).
According to Nadia, every item in the trademark registration was sold at each Basic store, even though the stores would sometimes run out of certain items. (Trial Tr. Vol. 3 at 109-10). David testified that running out of Spiral-branded items was possible because there could be inconsistency in manufacturing due to varying demand for third-party goods in Basic's factory. (Trial Tr. Vol. 2 at 133-34). David stated that Basic "would run out of stuff all the time" but that in all stores Basic sold all of the Basic Goods. (Trial Tr. Vol. 4 at 141). Additionally, both Jaime Alonso, the employee in charge of garment design in Basic's factory, and Enrique Saucedo, the factory manager, testified that all Basic Goods came with sewn-in labels depicting the Basic Mark, with the exception of slippers. (Trial Tr. Vol. 3 at 147, 156, 161-62, 165-66). All of Basic's witnesses agreed that starting in 2008, all of Basic's Goods, including slippers, had sewn-in labels depicting the Basic Mark.
With regard to "jeans"-a category listed in Basic's trademark-Alonso testified that Basic produced denim jeans starting in 1997. (Trial Tr. Vol. 3 at 162-63). Additionally, Nadia testified that Basic sold denim khakis, (Trial Tr. Vol. 2 at 49), and David testified that khaki was a "twill cotton material," which he characterized as "denim," (Id. at 125). During Hilel's direct examination, he was shown photographs of Basic's stores from 1997 to 2016 and in several of the photographs he identified a "camouflage pant," (Trial Tr. Vol. 4 at 35-36, 44, 46, 122), which he characterized as a "Dakota jean," (id. at 21, 35, 36,46). Alonso testified that the Dakota jean was made out of a heavy fabric that required special machinery. (Trial Tr. Vol 3 at 163-64).
2. Nadia's 2007 Deposition
In 2007, when Nadia was deposed in the Spira Footwear case, she brought several exemplars of Basic Goods to the deposition that did not have sewn-in labels with the Basic Mark. (Trial Tr. Vol. 2 at 47; see Ex. 122). Specifically, the Basic Mark did not appear on the scarves, hats, gloves, or socks.[13] (Trial Tr. Vol. 2 at 47). At trial, Nadia explained that the Basic Goods she brought to the 2007 deposition did not have sewn-in labels depicting the Basic Mark because she ordered them directly from the factory, which was unusual because her sons typically placed the orders. (Id. at 31). Nadia testified that she placed *1354 the order with the factory manager, Saucedo, whom she informed that she was running out of certain Basic Goods. (Id. at 31, 86-87). Nadia testified that Saucedo then sent her Spiral goods, but some of them did not have sewn-in labels with the Basic Mark. (Id. at 86-87).
Nadia offered an alternative explanation: that the exemplars she took to the deposition "were returns ... so maybe that's the one that I grabbed. I don't remember, but normally everything has had labels but the slippers." (Id. at 47). Nadia also offered a third explanation: that the exemplars were personal items from her house that did not have labels because "they would send me things without [a] label." (Id. at 84-85).
David confirmed Nadia's first explanation-that Nadia called the factory directly to order the garments that were sent without sewn-in labels. (Id. at 124). David testified that Nadia's order from the factory was not typical and ordinarily when David or Hilel placed an order they would specify how they wanted the goods to be made. (Id. ). Saucedo confirmed that in response to Nadia's unusual order in 2007 he sent some Basic Goods without sewn-in labels. (Trial Tr. Vol. 3 at 147).
3. Findings of Fact
Even though Nadia equivocated in her explanation about why the exemplars from 2007 did not have sewn-in labels with the Basic Mark, the Court finds based on the testimony of David, Saucedo, and Alonso that all of the goods listed in Basic's trademark registration, with the exception of slippers, had sewn-in labels displaying the Basic Mark from 1997 through 2007. The Court finds that, from 1997 through 2007, Basic sold all items listed in its trademark registration with sewn-in labels depicting the Basic Mark, with the exception of slippers, which did not have sewn-in labels. The Court further finds that, from 1997 through 2007, Basic sold slippers that were bound with a hangtag depicting the Basic Mark and that Basic sold slippers in proximity to display signs that depicted the Basic Mark. Finally, the Court finds that from 1997 through 2007, Basic sold khaki pants, camouflage pants, and Dakota jeans made out of a denim material.
H. Sale of Basic Goods from 2008 to 2017
1. Operation of "Spira" Stores
In 2008, Basic did not operate a retail store or sell Basic Goods, (Trial Tr. Vol. 2 at 165), but it acquired the rights to sell clothing under the name "Spira" and started to sell Spira-branded clothing in retail stores named "Spira." (Id. at 35-36; 147-48; Ex. 99). Basic acquired these rights after Basic and Spira Footwear settled their dispute in the Spira Footwear case. (Ex. 99). Over the next several years, Basic operated several stores under the "Spira" name and three stores under the "Spiral" name. (Trial Tr. Vol. 2 at 36, 68, 140-41; Trial Tr. Vol. 3 at 111). David testified that under the Spira brand, Basic sold jackets, pullovers, hats, trousers, t-shirts, vests, shorts, underwear, shoes, and headbands. (Trial Tr. Vol. 2 at 149-51). These goods had sewn-in labels that depicted the word "Spira." (Id. at 70).
David, Hilel, and Nadia each testified that Basic sold Basic Goods with sewn-in tags depicting the Basic Mark at the stores operated under the Spira name. (Id. at 151; Trial Tr. Vol. 3 at 111-12; Trial Tr. Vol. 4 at 20-53, 122-29). Nadia testified that the Spira and Spiral brands were given equal treatment in the stores, but she could not provide a breakdown of the percentage of sales of the Spira versus Spiral brands.[14] (Trial Tr. Vol. 2 at 78-79).
*1355 This is because Basic does not maintain a regular inventory management system and thus Basic is unable to provide detailed reports of sales by the type of garment or brand. (Trial Tr. Vol. 2 at 147, 154; Trial Tr. Vol. 4 at 19-20). However, David estimated that sales from Spira stores were split fifty-fifty between Spira goods and Basic Goods. (Trial Tr. Vol. 2 at 166).
During Hilel's direct examination, he viewed interior photographs of Basic's retail stores operating from 1997 to 2016. In those photographs, Hilel identified all of the Basic Goods listed in the trademark registration. (Trial Tr. Vol. 4 at 20-53, 122-29; Ex. 160). Many of the stores depicted in the photographs had large "Spiral" signs over the front entrances, but the rest of the signs displayed throughout the stores advertised that the products were made out of Polartec fabric. (Ex. 160 at 1-42).
Although Basic does not maintain its own website, in 2014 it began selling Basic Goods on a third-party online retailer, Overstock.com. (Trial Tr. Vol. 2 at 168, 201; Trial Tr. Vol. 4 at 111). As of December 2016, Basic sold only certain Basic Goods on Overstock.com: fleece vests, jackets, pants, and pullovers. (Trial Tr. Vol. 2 at 138-39; Ex. 20). Through Overstock.com, Basic sold its Basic Goods in many states, including Florida. (Trial Tr. Vol. 4 at 114).
2. Dr. Frank's Expert Testimony
During its case-in-chief, Spiral Direct called Robert Frank, Ph.D., to testify as an expert on trademark research. (Trial Tr. Vol. 2 at 210). In 2014 and 2016, Dr. Frank conducted extensive research on Basic and its sale of Basic Goods in online databases, which included print and online news media.[15] (Id. at 216-39). While researching, he did an Internet search for "Spiral clothing" on Google.com. That search revealed that all but one of the listings on the first page of Google's search results were for Spiral Direct's goods rather than Basic's Goods. (Ex. 152; Trial Tr. Vol. 3 at 37-45). Dr. Frank further testified that 95% of customers stop their search after viewing the first page of search results. (Trial Tr. Vol. 3 at 45).
Dr. Frank found no evidence that in 2014 or 2016 Basic sold pullovers, hats, t-shirts, jeans, shorts, underwear, slippers, socks, gloves, headbands, or scarves. (Trial Tr. Vol. 2 at 246-49). He also opined that based on his online research, Basic had not marketed those goods under the Basic Mark from 2014 to 2016. (Id. at 248).
Additionally, in February 2016, Dr. Frank conducted an undercover visit of a store operated by Basic under the name "Spira" at the Cherry Creek Mall in Cherry Hills, Colorado, to see what Basic sold and how it branded its goods, (Id. at 249-50). During that visit, Dr. Frank took photographs of the merchandise in the store and observed that Basic had fifteen to twenty-five racks of clothing. (Id. at 249-51). On direct examination, Dr. Frank testified that the only garments with sewn-in labels depicting the Basic Mark were jackets that occupied only two racks in the store. (Id. at 253-54; see Ex. 177). Dr. Frank testified that he did not see any vests, shorts, or headbands for sale under the Basic Mark. (Trial Tr. Vol. 2 at 261). Dr. Frank estimated that about 50 out of 400 or 500 garments in the store had sewn-in *1356 labels depicting the Basic Mark. (Id. at 262-63). Dr. Frank also testified that all garments in the store had hangtags depicting only the "Spira" brand name. (Id. at 252-54; Exs. 175 & 176). Dr. Frank noted that there were no display signs advertising Basic Goods in the store. (Trial Tr. Vol. 2 at 254).
Dr. Frank stated that during his visit to the store he asked Nadia if the store sold boots, gloves, socks, scarves, jeans, or underwear under the Basic Mark. (Id. at 259-60). He recalled that Nadia told him that she sold none of those items except for scarves and that gloves were out of stock. (Id. at 260). Dr. Frank's findings from his visit to the Cherry Creek Mall store were consistent with his online research, which was the foundation for his opinion that, since 2014, Basic has not sold a majority of the goods listed on its trademark registration under the Basic Mark. (Id. at 261-63).
During cross-examination, Basic's counsel elicited testimony from Dr. Frank that cast significant doubt on the accuracy of his online research methods. Specifically, Dr. Frank's online research did not reveal: that Basic operated numerous retail stores under the Spiral name; that Basic was exclusively a brick-and-mortar retailer between the years 1997 and 2013; or the date that Basic started selling its products on Overstock.com. (Trial Tr. Vol. 3 at 12-15, 18). Most significantly, Dr. Frank acknowledged that his extensive online research did not negate the possibility that Basic was selling all of the goods listed in its trademark registration in physical stores between 1997 and 2016. (Id. at 19). Further, Dr. Frank was unable to recall whether particular items of clothing shown in his own photographs from inside the Cherry Creek Mall store had sewn-in labels depicting the Basic Mark. (Id. at 22-27). And Dr. Frank expounded on his previous testimony, stating that in the Cherry Creek Mall store he observed-in addition to jackets-pullovers, pants, and vests sold under the Basic Mark. (Id. at 28-29).
Nadia testified that she did not recall a conversation with Dr. Frank but recalled being upset by Dr. Frank's investigative presence in the store and repeatedly answering "no" to each of his questions about whether Basic sold certain categories of Basic Goods simply to shoo him out of the store. (Id. at 117-20, 131-32). Nadia stated that Basic sold all of the items Dr. Frank inquired about because she had a "huge table full of accessories and behind the counter, all over the store." (Id. at 119). Nadia testified she sold Basic Goods in the following categories at the Cherry Creek Mall store: pullovers, hats, Dakota jeans, t-shirts, vests, underwear, slippers, socks, gloves, headbands, and scarves, although she noted that she had run out of gloves. (Id. at 113-15). Hilel further identified in Dr. Frank's photographs of the Cherry Creek Mall store: camouflage jeans, scarves, hats, pullovers, pants, and underwear sold under the Basic Mark. (Trial Tr. Vol. 4 at 122-26; Exs. 173, 174, 178, 179, & 180).
3. Closing of Basic's Last Retail Store and Intent to Open New Store
Basic stopped manufacturing Basic Goods late in 2015 and for a few months in early 2016 due to Basic's obligations to private-label customers. (Trial Tr. Vol. 2 at 81-82, 135-36; Trial Tr. Vol. 4 at 66). In May 2016, Basic's Cherry Creek Mall store closed and Basic sold its rights to the Spira brand; since then, Basic has not operated a retail store under either the "Spira" or "Spiral" names. (Trial Tr. Vol. 2 at 64-66, 82, 156; Ex. 138 at 2). Basic obtained a new retail space in 2016, but because Nadia suffered an injury and her husband suffered a stroke, Basic was unable to open seasonal stores. (Trial Tr. Vol. 3 at 115-16; Trial Tr. Vol. 4 at 62). Hilel *1357 testified that at no point did Basic intend to abandon its mark. (Trial Tr. Vol. 4 at 65).
By the time of trial in early June 2017, Basic had added several categories of Basic Goods to its listing on Overstock.com. (Trial Tr. Vol. 2 at 139-40). And Basic is presently manufacturing Spiral goods in the following categories: jackets, vests, underwear, shorts, technical t-shirts, pullovers, hoodies, bottoms, hats, shorts, sun sleeves, arm warmers, and headbands. (Trial Tr. Vol. 2 at 137; Trial Tr. Vol. 4 at 67). Hilel testified that Basic is currently planning to open a Spiral store in Colorado. (Trial Tr. Vol. 4 at 64).
4. Findings of Fact
Based on the consistent testimony of Nadia, Hilel, David, Alonso, and Saucedo, the Court finds that all Basic Goods manufactured after 2007 came with sewn-in labels depicting the Basic Mark. The Court finds that Dr. Frank's online research, which involved surveying various print and online media, is unreliable to the extent it formed the basis for his opinion that Basic did not sell certain categories of Basic Goods between 2014 and 2016. The Court finds that Basic sold at least some categories of Basic Goods in each of the stores it operated under the "Spira" name.
I. Trademark Renewal and Incontestability
On January 19, 2005, Basic filed a declaration with the USPTO stating that it continued to use the Basic mark in commerce on the goods listed in its registration. (Ex. 8). On June 27, 2005, Basic filed a "declaration of incontestability" of the Basic Mark with the USPTO, declaring that "[t]he mark has been in continuous use in commerce for five consecutive years after the date of registration ... and is still in use in commerce on or in connection with all goods and/or services as identified above." (Ex. 10 at 4). And on December 17, 2008, Basic filed a "combined declaration of use in commerce and application for renewal of registration of mark" with the USPTO. (Ex. 12). Each of these declarations represented to the USPTO that Basic was using its Basic Mark in commerce on the goods listed in its trademark registration.
III. Conclusions of Law
A. Basic's Claims of Trademark Infringement
Basic alleges in its counterclaims that Spiral Direct is infringing the Basic Mark under federal and Florida law.[16] "A person is liable for infringement if he uses a mark in commerce that is confusingly similar to a registered mark." Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, The Ecumenical Order. 809 F.3d 1171, 1183 (11th Cir. 2015) (hereinafter " Sovereign Military II") (citing 15 U.S.C. § 1114(1)(a) (providing a trademark infringement cause of action for owners of registered trademarks) ). "A plaintiff bringing an infringement action must prove 'first, that its mark is valid and, second, that the defendant's use of the contested mark is likely to cause confusion.' " Id. (quoting Dieter v. B & H Indus., of Sw. Fla., Inc., 880 F.2d 322, 326 (11th Cir. 1989) ).
Once a trademark owner registers its mark with the USPTO and thereafter *1358 uses the mark continuously for five years, "the Lanham Act allows the owner of [the] registered trademark to obtain incontestable status by filing an affidavit affirming that certain statutory requirements have been met." Wilhelm Pudenz, GmbH v. Littlefuse, Inc., 177 F.3d 1204, 1208 (11th Cir. 1999) (citing 15 U.S.C. § 1065 ). In 2005, Basic fulfilled these requirements and the Basic Mark obtained "incontestable status." (See Ex. 10).
"Incontestability offers ... benefits for plaintiffs complaining about an infringement." Sovereign Military II, 809 F.3d at 1183. "With respect to the first element of infringement-validity-incontestability provides 'conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce.' "[17] Id. (emphasis added) (quoting 15 U.S.C. § 1115(b) ).
However, "the term 'incontestable' is itself somewhat confusing and misleading because the Lanham Act expressly identifies over 20 situations in which infringement of an allegedly incontestable mark is permitted." Park 'N Fly, Inc., v. Dollar Park & Fly, Inc., 469 U.S. 189, 206, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) (Stevens, J. dissenting). In its claims for declaratory relief and in its affirmative defenses to Basic's claims of trademark infringement, Spiral Direct asserts three enumerated defenses to an incontestable trademark: (1) "[t]hat the registration or the incontestable right to use the mark was obtained fraudulently," 15 U.S.C. § 1115(b)(1) ; (2) "[t]hat the mark has been abandoned by the registrant," id. § 1115(b)(2) ; and (3) that "the use of the mark registered ... infringes a valid right acquired under the law of any State or Territory by use of a mark ... continuing from a date prior to the date of registration," known as the "prior use" defense, 15 U.S.C. § 1065. (Docs. 16 & 41). Spiral Direct also asserts as a non-enumerated defense that the Basic Mark is "void ab initio."
Spiral Direct does not specifically cite the prior use defense provided in 15 U.S.C. § 1065. Rather, it asserts in its Amended Complaint that "[t]he Spiral Parties have been using one or more of their Spiral Marks in the US since at least 1993, long prior to the first use of the [Basic] Mark by [Basic]." (Doc. 16 ¶ 41). And, as an affirmative defense to Basic's counterclaims, Spiral asserts that Basic's counterclaims "are barred by the prior use in commerce of the SPIRAL trademark" by Spiral. (Doc. 41 ¶ 52). The Court assumes that Spiral Direct is asserting the prior use defense in 15 U.S.C. § 1065 because it is the only "prior use" defense that is consistent with Spiral Direct's allegations. See generally Sovereign Military II, 809 F.3d at 1185 (citing two other prior use defenses in 15 U.S.C. § 1115(b)(5) & (6), one of which is available to a junior user of a mark and the other which is available to a senior user who holds a registered trademark).
1. Spiral Direct's Claims and Defenses Regarding Basic's Claims of Infringement
a. Fraud
Spiral Direct alleges that Basic obtained its trademark registration, including its subsequent renewals and incontestable status, through fraud on the USPTO because Basic did not use the Basic Mark on any of the goods listed in its trademark application until after it filed its application on September 17, 1997. "The party seeking to cancel a mark bears the burden of proving the alleged fraud by clear and *1359 convincing evidence." Angel Flight, 522 F.3d at 1209. "This is necessarily a heavy burden, and any doubt must be resolved against the charging party." Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Florida Priory of Knights Hospitallers of Sovereign Order of Saint John of Jerusalem. Knights of Malta, Ecumenical Order, 702 F.3d 1279, 1289 (11th Cir. 2012) (hereinafter " Sovereign Military I") (internal quotations omitted).
"At any time, a party may petition to cancel a registered mark on the ground that the registration was procured by fraud, even if that mark has become incontestable." Id. (citing 15 U.S.C. §§ 1064(3), 1119 ). "Fraud occurs when an applicant knowingly makes false, material representations of fact in connection with an application for a registered mark." Angel Flight, 522 F.3d at 1209. "Fraud further requires a purpose or intent to deceive the [USPTO] in the application for the mark." Sovereign Military I, 702 F.3d at 1289. "Subjective intent to deceive, however difficult it may be to prove, is an indispensable element in the analysis." In re Bose Corp., 580 F.3d 1240, 1245 (Fed. Cir. 2009). "Of course, because direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence." Id. (internal quotation omitted). "When drawing an inference of intent, 'the involved conduct, viewed in light of all the evidence ... must indicate sufficient culpability to require a finding of intent to deceive.' " Id. (alteration in original) (quoting Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed. Cir. 1988) ).
Spiral Direct's theory of fraud is that Basic did not use the Basic Mark in commerce before applying for registration. An application for trademark registration must include "the date of the applicant's first use of the mark, the date of the applicant's first use of the mark in commerce, the goods in connection with which the mark is used, and a drawing of the mark." 15 U.S.C. § 1051(a)(2). Additionally, the applicant must provide a verified statement that includes, among other things, a specification that "the mark is in use in commerce" and that "to the best of the verifier's knowledge and belief, the facts recited in the application are accurate." 15 U.S.C. § 1051(a)(3)(B), (C).
The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce-
(1) on goods when-
(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
(B) the goods are sold or transported in commerce ....
15 U.S.C. § 1127. And the word "commerce" means "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127.
In the trademark context, "use in commerce" traditionally "requires a sale or transportation across a state line." J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition § 19:117 (5th ed. 2017) ; id. § 19:123 ("Although the rendering of services from a single location to interstate travelers has been held to be a rendering of services in interstate commerce, the 'traditional view' holds that such a local sale of goods to interstate customers is not 'in commerce.' " (emphasis in original) (internal footnotes omitted) ). However, the modern view is that *1360 the sale of goods that are imported into the United States and sold locally-not across state lines-constitute "use in commerce" if those local sales substantially affect interstate commerce. See In re Application of Silenus Wines, Inc., 557 F.2d 806, 809-12 (C.C.P.A. 1977) ; see McCarthy, supra, § 19:117 ("The holding of Silenus would seem to change the 'traditional view' at least to the extent that a merchant who orders trademarked goods produced for it in another state and then sells those goods in one state, qualifies for federal registration of that trademark.").
For an applicant to rely solely on transportation of goods-without any sales-to qualify as "use in commerce," the transportation must be sufficiently open or public. McCarthy, supra, § 19:118 ("A required element of use in commerce is some element of open or public use."). "Thus, purely intra-company shipments only for in-house experimentation, evaluation or preparation do not constitute bona fide shipments to satisfy the 'transportation' alternative." Id.; see Gen. Healthcare Ltd. v. Qashat, 364 F.3d 332, 337 (1st Cir. 2004) ("The public purpose underlying trademark protection is the preservation of good will associated with the mark, and public awareness is obviously a requisite of good will."); cf. Planetary Motion. Inc., v. Techsplosion, Inc., 261 F.3d 1188, 1196 (11th Cir. 2001) (" '[S]ecret, undisclosed internal shipments are generally inadequate.' " (quoting Blue Bell, Inc., v. Farah Mfg. Co., 508 F.2d 1260, 1265 (5th Cir. 1975) ) ). Accordingly, mere importation of a good into the United States, without a sale, does not qualify as use in commerce because "the intended buying public is not exposed to the mark" and thus "the requirement of open and public exposure" is not met. McCarthy, supra, § 19:118 ; Avakoff v. S. Pac. Co., 765 F.2d 1097, 1098 (Fed. Cir. 1985) (concluding that an interstate shipment of trademarked goods from the manufacturer to the trademark owner was "purely a delivery of the goods to [the] applicant from the manufacturer.... That is, it was a shipment of the goods in preparation for offering the goods for sale. It did not make the goods available to the purchasing public. Without more, this type of shipment is clearly not activity amounting to a sale or transportation of the goods in commerce and does not constitute a bona fide shipment sufficient to lay a foundation for federal registration."); The Clorox Co. v. Salazar, 108 U.S.P.Q.2d 1083 (T.T.A.B. Sept. 26, 2013) ("Even assuming arguendo that the transport of goods bearing applicant's mark from applicant's [foreign] manufacturer to applicant occurred as early as the filing date of his application, such use does not constitute use in commerce as defined by the Trademark Act.").
Here, the Court has already found that Basic did not make any sales-either in Texas or across state lines-before September 17, 1997, when David filed Basic's application for trademark registration that stated that the "[a]pplicant is using the mark in commerce or in connection" with "[j]ackets, pullovers, hats, jeans, T-shirts, vests, shorts, underwear, shoes, ... socks, gloves, headbands and scarves."[18] (Ex. 6 *1361 at 1-2). And there is no evidence that Basic transported its goods in such an open or public way that it exposed its intended customers to the Basic Mark. Therefore, the Court concludes that David made a false, material representation of fact in Basic's trademark application when he stated that the Basic Mark was used in commerce before September 17, 1997. 15 U.S.C. § 1051(a) (providing that use in commerce is an essential element of a trademark application); Angel Flight, 522 F.3d at 1209 ("A misstatement of the date of first use in the application is not fatal to the securing of a valid registration as long as there has been valid use of the mark prior to the filing date." (quoting Car Subx Serv. Sys., Inc., v. Exxon Corp., 215 U.S.P.Q. 345, 351 (T.T.A.B. 1982) ) ).
The remaining question is whether David had the requisite intent to deceive the USPTO. "[T]here is a material legal distinction between a 'false' representation and a 'fraudulent' one, the latter involving an intent to deceive, whereas the former may be occasioned by a misunderstanding, an inadvertence, a mere negligent omission, or the like." In re Bose Corp., 580 F.3d at 1243 (internal quotation and citation omitted). "In other words, deception must be willful to constitute fraud." Id. The requisite "intent must often be inferred from the circumstances and related statement made." Id. at 1244 (citation and internal quotation omitted).
For example, in In re Bose Corp., the Bose Corporation owned the trademark "wave." Id. at 1242. Bose filed a Section 8 affidavit of continued use and a Section 9 renewal application in which Bose's general counsel represented that the trademark was still in use in commerce on audio tape recorders and players. Id. However, Bose was not selling those products during the relevant time period; instead, it only repaired previously sold audio tape recorders and players. Id. Bose's general counsel testified that he believed that the trademark was used in commerce because "in the process of repairs, the product was being transported back to customers." Id. (internal quotation marks omitted). Ultimately, even though the court found that the general counsel's representation to the USPTO was material and false, it concluded that the general counsel's honest misunderstanding did not support an inference of deceptive intent, and thus Bose did not commit fraud on the USPTO. Id. at 1246-47.
Conversely, where a trademark owner knows that he has not used a trademark in commerce but nonetheless submits an application based on use of the mark in commerce, the Court may infer a fraudulent intent. Nationstar Mortg. LLC v. Ahmad, 112 U.S.P.Q.2d 1361 (T.T.A.B. Sept. 30, 2014). This was the case in Nationstar, where a real estate agent filed an application for the "Nationstar" mark for use on a broad range of services that included "real estate brokerage," "residential and commercial property and insurance brokerage," and "mortgage brokerage." Id. at *1. The opposing party alleged that the agent obtained the Nationstar mark through fraud on the USPTO because he had not used the Nationstar mark in commerce on any of the services by the time he filed the application. The court ultimately found that the agent's testimony-that he had used the mark in commerce-was not credible and concluded that he was not lawfully permitted to "hold himself out as a mortgage broker, insurance broker, or real estate broker because he was not properly licensed at the time he filed the application." Id. at *11-12.
The Nationstar court factored in the agent's credibility in determining his culpable intent. See id. at *13 ("Specifically, we have inferred culpable intent in cases where we have found an accused party's *1362 testimony to lack credibility."). The court concluded that "in light of the manifest lack of credibility of [the agent's] testimony, ... [his] false representations regarding his use of [the Nationstar mark] in connection with all of the services listed in the application were made knowingly and with the intent to deceive the USPTO." Id. at *12. The court reasoned:
The record clearly establishes that [the agent] knew he was not rendering all of the identified services as of the filing date of his application, and nevertheless he swore that he was using the mark ... in commerce in connection with all of the services.... [The agent's] naming of services on which he knew the mark had not been used amounted to an attempt to obtain a right based on the false statement, i.e., to induce the USPTO into approving registration of his mark.
Id. [19]
Here, by the time David filed the application for trademark registration in September 1997, he had been managing Basic for four years and had manufactured and sold clothing to private-label customers totaling $3 million in revenue. Thus, David was familiar with the manufacture and distribution of clothing and knew that any transportation between Basic's factory in Mexico and its warehouse in Texas was not "open and public exposure." Additionally, David knew that Basic's first retail store had not yet opened.
In the Spira Footwear case, however, David attested that Basic's application to the USPTO was accurate because David had been "setting up" the Michigan Avenue store "with all of the items listed as being sold in association with the SPIRAL mark by the time [he] signed that declaration." (Ex. 7 ¶ 24). But a plain reading of David's declaration in the Spira Footwear case shows that he omitted the date that the Michigan Avenue store opened and surreptitiously conflated his "setting up" the store with achieving sales from that store. David's declaration not only was intended to obfuscate the opening date of the store, it had the effect of doing so.
The Western District of Texas relied on David's declaration in deciding a motion for summary judgment in Basic's favor, stating that "[o]n June 15, 1997 , [Basic] began selling its clothing line through retail stores under [its] brand name," and in a footnote to that sentence observing that "[Basic] operated its first store at 900 N. Michigan Avenue, Chicago Illinois, over a period of three-and-a-half years." Spira Footwear, 545 F.Supp.2d at 592 & n.1 (footnote omitted) (emphasis added). Ultimately, the Spira Footwear court found that Spira Footwear failed to show that Basic fraudulently misrepresented a fact when it applied for its trademark registration. Id. at 595. In doing so, the court concluded:
The evidence tends to show that [Basic] began selling slippers when it commenced business under the name SPIRAL in 1997. While it is true that [Basic] cannot produce any written documentation that [Basic] manufactured or sold the slippers, numerous *1363 employees sold SPIRAL slippers at various SPIRAL retail stores. First, David Chowaiki observed the slippers as a finished product at [Basic] warehouses and then assisted in their delivery at SPIRAL retail stores. Next, David Chowaiki physically placed SPIRAL slippers on the store shelves for sale.... Specifically, beginning in 1997 and continuing to date, Nadia Chowaiki[ ] has sold slippers in various sizes and colors.
Id. at 594-95.
It is clear that the court relied on David's misleading declaration, which led to an analysis based on erroneous facts. This Court is troubled by the fact that there is no indication in the Spira Footwear docket that Basic ever sought to correct the court's misapprehension that Basic was selling goods from the Michigan Avenue store as of June 15, 1997.
Based in part on David's and Hilel's declarations in the Spira Footwear case, this Court has found that there was no credible evidence regarding sales made before September 17, 1997.[20] Like the agent in Nationstar who knew that he could not operate as a broker at the time he filed his trademark registration, the unavoidable conclusion here is that David knew that Basic made no sales before September 17, 1997, because Basic's first store-on Michigan Avenue-had not yet opened.
The Court concludes that that there is clear and convincing evidence that Basic obtained its trademark through fraud on the USPTO. Accordingly, Basic's registration for the Basic Mark is due to be cancelled. Spiral Direct prevails on its claim of invalidity based on fraud (Count IV).
Even though the Court has concluded that Basic's trademark registration must be cancelled based on fraud before the USPTO, the Court nonetheless analyzes Spiral Direct's remaining defenses as well.
b. Abandonment
Spiral Direct next claims that Basic abandoned its trademark by using the Basic Mark "on a limited number of items in a very limited quantity for a very limited time." (Doc. 16 at 54). Specifically, Spiral Direct argues that since 2007, Basic has not sold several categories of Basic Goods, including jeans, shoes, gloves, socks, headbands, scarves, and underwear.
A court may cancel a trademark registration in whole or in part upon a showing that a trademark has been abandoned by its user. 15 U.S.C. §§ 1064(3) & 1119. The Lanham Act requires "bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. "[A] trademark is deemed abandoned, and, thus no longer valid, '[w]hen its use has been discontinued with intent not to resume such use.' " Nat. Answers, Inc., v. SmithKIine Beecham Corp., 529 F.3d 1325, 1329 (11th Cir. 2008) (quoting 15 U.S.C. § 1127 ). " '[I]ntent not to resume [use] may be inferred from circumstances.' " Id. (second alteration in original) (quoting 15 U.S.C. § 1127 ). "Such an intent cannot be far-flung or indefinite; rather there must be an intent to resume use within the reasonably foreseeable future in the United States." Id. (internal citations and quotation marks omitted).
*1364 Spiral Direct failed at trial to satisfy its burden of showing that Basic abandoned the Basic Mark. Between November 1997 and 2007, Basic sold all categories of its Basic Goods in stores named "Spiral" with either sewn-in labels or hangtags bearing the Basic Mark. And although Basic did not sell Basic Goods in 2008, between 2009 and 2016 it sold Basic Goods in seasonally operated stores named "Spira" and in at least three stores named "Spiral." It is undisputed that Basic sold jackets, pullovers, pants, and vests bearing the Basic Mark from 2013 to the time of trial in either its retail stores or on Overstock.com. And the Court has already found that each category of Basic Goods produced after 2007 had sewn-in labels bearing the Basic Mark.
The Court is unconvinced by Spiral Direct's argument that Basic "has had almost two years in this case to produce some evidence that would support its continuous use of the [Basic Mark] on all of the [Basic Goods] as of the issuance date of the [trademark registration]." (Doc. 146 at 20). This erroneously suggests that the burden is on Basic to disprove that it has abandoned its mark. On the contrary, the burden is on Spiral Direct, and its strongest evidence that Basic abandoned the Basic Mark is the testimony of Dr. Frank, who conducted extensive online research and visited Basic's Spira store in the Cherry Creek Mall in 2016. However, as discussed above, the Court finds that Dr. Frank's online research was unreliable to the extent it sought to establish that Basic abandoned certain categories of goods from 2014 through 2016. Therefore, Spiral Direct's singular best evidence is Dr. Frank's testimony as to what garments Basic was selling in its Cherry Creek Mall store during his visit there in 2016. During that visit, Dr. Frank observed that Basic sold jackets, pullovers, pants, and vests under the Basic Mark. And Dr. Frank testified that Nadia admitted during his visit that Basic did not sell jeans, boots, t-shirts, gloves, socks, scarves, or underwear. Dr. Frank did not, however, check numerous garments in the store for sewn-in tags bearing the Basic Mark. Significantly, Hilel subsequently identified many goods depicted in Dr. Frank's photographs of the Cherry Creek Mall store as being Basic Goods.
Even accepting Dr. Frank's testimony that Basic was not selling several categories of Basic Goods, during his visit in 2016, that testimony is insufficient to establish abandonment. There are numerous plausible explanations other than abandonment as to why Basic was not selling certain categories of goods on that day. For instance, the missing goods could have been sitting on a table out of view or may have been out of stock. Indeed, members of the Chowaiki family testified that Basic would sometimes run out of certain Basic Goods but that it would always continue selling those items in the future. This is consistent with Basic's business practice of relabeling overrun garments that it produces for private-label customers. Of course, if the factory is consumed with producing garments for private-label customers, it will not be able to produce as many goods under the Basic Mark. But this does not mean that Basic abandoned the Basic Mark each time Basic ran out of a certain category of garment. On the contrary, the evidence at trial showed that Basic sold at least some of the Basic Goods at all times. Thus, the Court is not persuaded that Basic abandoned the Basic Mark by failing to keep in stock all of the goods listed in its trademark registration, so long as Basic intended to sell those goods within the reasonably foreseeable future.
Spiral Direct additionally argues that Basic has not sold "jeans" since the late 1990s and that thus Basic has abandoned *1365 the Basic Mark with regard to that good. Spiral Direct has not argued for a particular definition of the term "jeans," but implied in its argument is that none of the pants sold by Basic are "jeans." The term "jeans" has various dictionary definitions, each of which has a common characteristic-they are pants made out of "twilled cotton fabric." See Dictionary.com, http://www.dictionary.com/browse/jeans (last visited Dec. 7, 2017) (defining "jean" to mean "a sturdy twilled fabric, usually of cotton," and defining "jeans" to mean "pants of various fabrics, styled or constructed like blue jeans"); Merriam-Webster.com, https://www.merriam-webster.com/dictionary/jean (last visited Dec. 7, 2017) (defining "jean" to mean (1) "a durable twilled cotton cloth used especially for sportswear and work clothes" and (2) "pants usually made of jean or denim"); Oxford Dictionaries.com, https://en.oxforddictionaries.com/definition/jeans (last visited Dec. 7, 2017) (defining "jeans" to mean "[h]ard-wearing casual trousers made of denim or other cotton fabric"). Additionally, "twilled" cotton fabric is defined as "a textile weave in which the filing threads pass over one and under two or more warp threads to give an appearance of diagonal lines." Merriam-Webster.com, https://www.merriamwebster.com/dictionary/twill (last visited Dec. 7, 2017) (defining "twill").
During trial, Hilel several times identified in photographs of Basic's stores a "camouflage pant" which he characterized as a "Dakota jean." And Alonso testified that the "Dakota jean" was made out of a heavy fabric that required special machinery. Moreover, David testified that Basic produced khaki-colored jeans made of a "twill cotton material." Spiral Direct has not rebutted any of this testimony, and thus it did not meet its burden of showing that the garments Hilel identified as jeans were not made out of a "twilled cotton fabric" and thus, not "jeans."
Spiral Direct additionally argues that Basic does not have bona fide plans to open a new retail store. But it is undisputed that Basic has been selling several Basic Goods on Overstock.com and that it recently increased the variety of goods it sells on that website. This is sufficient to overcome an inference that Basic intended to abandon the Basic Mark by closing its last retail store in 2016.
Finally, Spiral Direct seeks to cancel the entire Basic Mark based on Basic abandoning only some categories of Basic Goods. But nowhere does Spiral Direct articulate a legal basis for "find[ing] that [Basic] abandoned whatever rights it had in the [Basic Mark]" because Basic has allegedly stopped selling some of the goods listed in the registration.[21] (Doc. 146 at 23).
In sum, Spiral Direct does not prevail on its claim of invalidity based on abandonment (Count III).
c. Prior Use
Spiral Direct contends that it is the senior user of the "Spiral" mark on clothing in the United States. This contention is based on two premises: first, that the assignment between Spiral Designs and Spiral UK is valid; and second, that Spiral Direct obtained valid common law trademark rights in the United States. Spiral Direct established the first basis, but it did not establish that it had obtained valid common law trademark rights in any state or territory before Basic registered its mark on January 19, 1999.
i. Assignment of the SD Mark
Basic argues that Spiral Direct does not hold a valid assignment of its *1366 predecessor's trademark rights. Specifically, Basic contends that the PVA that Spiral Designs executed during its debt reorganization in 1999 did not transfer its trademark rights to Spiral UK.
Spiral UK was not a party to the PVA, but the PVA characterized two transactions between Spiral Designs and Spiral UK. First, it stated that Spiral UK "purchased the goodwill and customer base of Spiral Designs for the sum of £ 1." Second, it stated that Spiral UK separately purchased Spiral Designs' assets for £ 46,825 but that Spiral Designs would retain ownership over its assets until Spiral UK paid Spiral Designs' creditors in full. It is undisputed that Spiral UK did not finish paying Spiral Designs' creditors until 2004. Basic argues that because the company's goodwill cannot be sold separately from the trademark, Spiral UK never obtained a valid assignment of the SD Mark.
It is true that trademarks may not be transferred separately from the goodwill of the business. Premier Dental Prods. Co. v. Darby Dental Supply Co., 794 F.2d 850, 853 (3d Cir. 1986). "A valid transfer of a mark ... does not require the transfer of any physical or tangible assets. All that is necessary is the transfer of the goodwill to which the mark pertains." Visa, U.S.A., Inc., v. Birmingham Tr. Nat'l Bank, 696 F.2d 1371, 1375 (Fed. Cir. 1982). But there is an exception to this general rule: "where there is 'continuity of management,' so that the assignee will continue to provide the same quality of service, a transfer without good-will is not subject to invalidation." J. Atkins Holdings Ltd. v. English Discounts, Inc., 729 F.Supp. 945, 950 (S.D.N.Y. 1990) (citing Marshak v. Green, 746 F.2d 927, 930 (2d Cir. 1984) ); id. at 951 ("[U]nder the 'continuity of management' exception recognized in Marshak, a viable business continues to operate as licensee of the marks."); Visa, U.S.A., 696 F.2d at 1376 (holding that a "naked assignment" of a trademark without the accompanying goodwill was valid because it did not serve to confuse consumers).
Here, even though Spiral UK bought Spiral Designs' goodwill and customer base in 1999 and did not acquire Spiral Designs' assets until 2004, there was continuity of management between both companies, and Spiral UK continued to sell the same goods under the same name to the same customer base. Thus, the assignment from Spiral Designs to Spiral UK was not an "assignment that separates the trademark from the goods or services upon which its reputation is based. To the contrary, this was an assignment... which [wa]s designed to continue the employment of the trademarks in connection with the same goods on which their reputation is based." J. Atkins Holdings Ltd., 729 F.Supp. at 950. Once the assignment was completed in 2004, Spiral UK stepped into the shoes of Spiral Designs for the purpose of priority in this trademark infringement analysis. Planetary Motion, Inc., v. Techsplosion, Inc., 261 F.3d 1188, 1192 (11th Cir. 2001) (citing Premier Dental Prods., 794 F.2d at 853 ("[F]ollowing a proper assignment, the assignee steps into the shoes of the assignor.") ).
ii. Spiral Direct's Common Law Trademark Rights
Next, Spiral Direct contends that it is the senior user of the Spiral trademark due to its adoption and continuous use of the SD Mark prior to Basic's registration of the Basic Mark in January 1999.
The prior use defense provides that an incontestable trademark may be defeated where "the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark ... continuing from a date prior to the date of registration." 15 U.S.C. § 1065. "Common-law trademark rights are 'appropriated *1367 only through actual prior use in commerce.' " Crystal Entm't & Filmworks, Inc. v. Jurado, 643 F.3d 1313, 1321 (11th Cir. 2011) (quoting Planetary Motion, 261 F.3d at 1193-94 ). Indeed, " 'the use of a mark in commerce ... must be sufficient to establish ownership rights for a plaintiff to recover against subsequent users under section 43(a).' " id. (emphasis omitted) (quoting Planetary Motion, 261 F.3d at 1195 ). Ownership rights are created in a mark where it is adopted and used "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." Id. (quoting Planetary Motion, 261 F.3d at 1195 ). Determining whether the mark was used "in a way sufficiently public" involves an inquiry "into the 'totality of the circumstances' surrounding the prior use of the mark 'to determine whether such an association or notice [was] present.' " Id. (quoting Planetary Motion, 261 F.3d at 1195 ). Importantly, "only actual use occurring prior to [another user's trademark] registration gives rise to enforceable common-law trademark rights." Tana v. Dantanna's, 611 F.3d 767, 780 (11th Cir. 2010) (emphasis in original) (citing 15 U.S.C. § 1065 ).
"Ownership of a mark requires a combination of both appropriation and use in trade. Thus, neither conception of the mark nor advertising alone establishes trademark rights at common law. Rather, ownership of a trademark accrues when goods bearing the mark are placed on the market." Blue Bell, 508 F.2d at 1264-65 (internal footnotes and citations omitted).[22] "[E]vidence of sales is highly persuasive."[23] Planetary Motion, Inc., 261 F.3d at 1195. But a party may establish the requisite use and association "even in the absence of sales." Id."To warrant protection, use of a mark 'need not have gained wide public recognition,' but '[s]ecret, undisclosed internal shipments are generally inadequate.' " Id. at 1196 (quoting Blue Bell, 508 F.2d at 1265 ); see also Crystal Entm't, 643 F.3d at 1321 ("[A] company prove[s] prior use of a mark sufficient to establish ownership when, among other things, 'the distribution' of the mark was 'widespread' because the mark was accessible to anyone with access to the Internet; the evidence established that 'members of the targeted public actually associated the mark ... with the [product] to which it was affixed'; 'the mark served to identify the source of the [product]'; and 'other potential users of the mark had notice that the mark was in use in connection with [the product].' " (all but first two alterations in original) (internal citations omitted) (quoting Planetary Motion, 261 F.3d at 1196-97 ) ). That said, de minimis use of a trademark is insufficient to establish trademark ownership rights.[24] Planetary Motion, 261 F.3d at 1196.
*1368 "Geographic considerations are also particularly relevant where a plaintiff holds only common-law trademark rights in a mark because it is well established that the scope of protection accorded [its] mark is coextensive only with the territory throughout which it is known and from which it has drawn its trade." Tana, 611 F.3d at 780. "Therefore, a [party] asserting common-law trademark rights ... against the owner of a registered mark, as here, bears the burden of establishing the right to use its mark by actual use in a given territory." Id. Indeed, "under common law principles, the senior user of a mark cannot monopolize markets that neither his trade nor his reputation has reached." Tally-Ho, Inc. v. Coast Cmty. Coll. Dist., 889 F.2d 1018, 1027-28 (11th Cir. 1989) (quoting J. McCarthy, supra, § 26:1, at 284).
Although "federal registration has the practical effect of freezing a prior user's enforceable trademark rights" to its existing territory, Tana, 611 F.3d at 780-81, a mark may have limited protection in a "zone of reasonable future expansion." Tally-Ho, 889 F.2d at 1027-28 n.15. This "zone of natural expansion" doctrine provides the senior user with some limited "breathing space" in which to expand beyond its current actual use. Id. at 1027-28. However, because this doctrine provides mere "breathing space," courts often narrowly define a senior user's zone of natural expansion. Id. at 1028 (" 'This theory has been seized upon by senior users to argue that defendant is occupying territory within its natural zone of expansion, even though it has not yet entered that market and defendant was concededly first in that remote area. In most cases, the courts have rejected this argument on the facts, narrowly defining the senior user's zone of natural expansion.' " (quoting McCarthy, supra, § 26:8 ) ). For example, " '[i]f the senior user is static, and has restricted use to only one small area, such as one city, a good-faith junior user may expand into a nationwide use of the mark, subject only to an exception in the small area occupied by the senior user.' " Id. (quoting McCarthy, supra, § 26:8). " 'However, if the senior user has constantly expanded its business by the date of the junior user's adoption of the mark, and if distances are not great, it may be that the senior user is entitled to exclusive rights in a zone of natural expansion which includes the junior user's area, even though no actual sales have yet been made in that area by the senior user.' " Id. (quoting McCarthy, supra, § 26:8). The Eleventh Circuit considers certain guidelines when attempting to define a senior user's zone of natural expansion:
(1) How great is the geographical distance from the senior user's actual location to a point on the perimeter of the zone of expansion?
(2) What is the nature of the business? Does it already have a large or small zone of actual market penetration or reputation?
(3) What is the history of the senior user's past expansion? Has it remained static for years, or has it continually expanded into new territories? Extrapolating prior expansion, how long would it take the senior user to reach the periphery of the expansion zone he claims?
*1369 (4) Would it require an unusual 'great leap forward' for the senior user to enter the zone, or is the zone so close to existing locations that expansion would be (or is) a logical, gradual, step of the same length as those previously made?
Tally-Ho, 889 F.2d at 1028 (quoting McCarthy, supra, § 26:9). Here, Spiral Direct argues that its catalog distributions, the existence of its website, and its mail-order sales establish nationwide ownership rights to the SD Mark in the United States.
(i) Catalog Distribution
Because Spiral Direct stepped into the shoes of Spiral Designs, in this section the Court will refer only to Spiral Direct, rather than to Spiral Designs, even where the actions described were actually taken by Spiral Designs. Although Spiral Direct distributed thousands of catalogs into the United States between 1993 and 1999, those distributions cannot be considered "use" of the SD Mark because those distributions did not "identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." Crystal Entm't, 643 F.3d at 1321 (internal quotation and citation omitted). Due to the format of the catalogs-which depicted the SD Mark only on the cover-customers could not differentiate which products in the catalog were goods sold under the SD mark from those sold under a third-party mark. The Court rejects Spiral Direct's argument that printing the Spiral Direct website address at the bottom of every other page in its catalog is the same as displaying the SD Mark. The Spiral Direct website address was printed on pages in the catalog where Spiral Direct was selling third-party goods that were not sold under the SD Mark. Therefore, the placement of the website address at the bottom of the page offered consumers no indication whether the goods depicted were goods sold under the SD Mark or a third-party mark.
As shown at trial, the catalogs contained various themed categories of goods under titles like "Alienz," "Tupac Shakur," "Liquid Blue," "Looney Tunes," "The Simpsons," and "Tribal." But only goods under certain themes were sold with sewn-in labels depicting the SD Mark.[25] For example, out of the themes listed above, only the Alienz, Tupac Shakur, and Tribal themes could have arrived with sewn-in labels depicting the SD Mark. The remaining themes were either licensed goods or third-party goods sold under their own trademarks. Thus, a customer viewing the catalog would have no idea what goods, if any at all, were associated with the SD Mark because it did not appear on any of the pages except for the cover. Indeed, a reasonable customer could have believed that Spiral Direct only re-sold third-party goods because the catalog did not distinguish SD Mark goods from third-party goods.[26] Therefore, Spiral Direct's catalog distributions do not constitute "use" of the SD Mark.
(ii) Website
Similarly, the Court cannot credit the existence of Spiral Direct's website as "use" of the SD Mark for establishing common law trademark rights. Spiral Direct argues that under Crystal Entertainment, "use of a mark on goods distributed over the [I]nternet is itself sufficient to *1370 establish prior ownership rights 'where distribution of the mark was widespread because the mark was accessible to anyone with access to the Internet.' " (Doc. 146 at 4 (further internal quotation omitted) (citing Crystal Entm't, 643 F.3d at 1321 ) ). Of course, sales or other distributions of goods bearing the SD Mark made through the Spiral Direct website may be considered in determining whether the SD Mark has been used to identify or distinguish the marked goods in an appropriate segment of the public mind. Here, however, Spiral Direct has produced no data regarding the number of customers who visited or purchased goods through the Spiral Direct website.
Simply operating a website that is accessible to every person in the United States does not confer common law trademark rights on the owner for the entire United States. For example, if an owner of a common law trademark made 1,000 sales of widgets bearing its trademark in Orlando, Florida, that owner would have a very good argument for having acquired trademark rights in Orlando, Florida-assuming that it is the senior user of the mark, of course. But if no Californians ever bought goods through the website, surely the common law trademark owner would not be able to claim ownership rights in California merely because the website is accessible by people in California. Indeed, without some affirmative interaction from the customer-i.e., downloading software or purchasing a product-a website essentially functions as an advertisement for the owner's goods. See Planetary Motion, 261 F.3d at 1191, 1196 (concluding that sharing trademarked software for free over the Internet was sufficient "use" of the trademark because end users' downloading of the software was "widespread distribution"). Accordingly, the mere operation of Spiral Direct's website does not constitute "use" of the SD Mark sufficient to grant it common law trademark rights.
(iii) Sales
Spiral Direct also argues that its mail-order sales in the United States establish that it sufficiently used the SD Mark before Basic's registration in 1999. The Court has found that Spiral Direct made the following numbers of sales into the United States: 12 sales in 1993; 100 sales in 1997; and 1,000 sales in 1999. And despite Spiral Direct's inability to produce its full sales records, it produced twenty-three invoices of sales made between 1996 and 1997 in twelve states. Spiral Direct additionally produced a table displaying its United States sales revenue and showing that its revenue was £ 256.85 in 1998 and £ 1,326.54 in 1999.[27] Moreover, the Court credited Sohail's testimony that ninety percent of Spiral Direct's sales were of goods with Spiral Direct's original designs as opposed to third-party goods.[28]
Even assuming that Spiral Direct's evidence of its sales in the United States was sufficient to show that the SD Mark was used "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark," Crystal Entm't, 643 F.3d at 1321 (internal quotation and citation omitted), Spiral Direct would also have to prove the geographic territories in which its customers and competitors associated the SD Mark with Spiral Direct's goods, see 15 U.S.C. § 1065 (providing that the "prior use defense" requires that "the use of a mark registered ... infringes a valid right acquired under *1371 the law of any State or Territory by use of a mark ... continuing from a date prior to the date of registration." (emphasis added) ); Tana, 611 F.3d at 780 (noting "burden of establishing the right to use ... mark by actual use in a given territory" (emphasis added) ).
On this inquiry, however, Spiral Direct essentially asks the Court to skip the step of determining Spiral Direct's geographic territory at the time Basic registered its trademark and simply conclude that "Spiral Direct has the right to enjoy its nationwide geographic zone of expansion." (Doc. 148 at 17 (emphasis added) ). The Court cannot justify making such a leap based on the evidence in this case. Aside from the twenty-three invoices of sales to twelve states, the Court has no evidence-neither documentary evidence nor trial testimony-of the number of sales Spiral Direct made in any geographic market in the United States. Spiral Direct's evidence that its combined catalog distribution and sales were in twenty-two states by 1998 and twenty-seven states by 1999 is insufficient to show that the public in those states "identif[ied] or distinguish[ed] the marked goods ... as those of the adopter of the mark." Crystal Entm't, 643 F.3d at 1321 (internal quotation and citation omitted).
And even if the Court agreed with Spiral Direct's representations that by 1999 it obtained common law trademark rights spanning twenty-seven states, Spiral Direct's territory would have been "frozen" in January 1999 when Basic obtained its registration. Tana, 611 F.3d at 781. The burden is on Spiral Direct to show that its penetration in twenty-seven states should afford it a "zone of natural expansion" in each of the remaining twenty-three states-giving consideration to the guidelines set forth in Tally-Ho: (1) the distance between Spiral Direct's territory and the zone of natural expansion, (2) the nature of Spiral Direct's business and the size of its current market penetration, (3) the history of Spiral Direct's previous expansion or market growth, and (4) whether the proposed zone of natural expansion would be an unusual "great leap forward" or so close to existing locations that expansion would be a step of the same length as those previously made. See Tally-Ho, 889 F.2d at 1028. Spiral Direct has addressed none of these points.
The Court cannot conclude based on Spiral Direct's reported sales and invoices showing sales into twelve states that by January 1999 Spiral Direct achieved a zone of natural expansion the size of the entire United States. The zone of natural expansion is a doctrine that affords senior users some "breathing space" in which they can expand beyond their current actual use. Tally-Ho, 889 F.2d at 1028. But providing Spiral Direct the right to expand into all remaining states would not provide "breathing space"; rather, it would provide a nationwide monopoly based on only a few hundred sales scattered throughout the United States.
Thus, Spiral Direct fails to establish that it obtained valid common law trademark rights in any identifiable territory by the time Basic acquired its registration on January 19, 1999. Accordingly, Spiral Direct's defense of "prior use" to Basic's incontestable trademark fails.
d. Void Ab Initio
Spiral Direct additionally argues that the Basic Mark is "void ab initio "-or "null from the beginning"-because Basic did not use the Basic Mark in commerce on any of the goods listed in its trademark application before applying for registration.[29] This defense ordinarily renders void *1372 a trademark not used before its application was filed. See Aycock Eng'g, Inc., v. Airflite, Inc., 560 F.3d 1350, 1357 (Fed. Cir. 2009). However, the applicability of this defense to incontestable trademarks is unclear.
The Sixth Circuit recently issued an unpublished opinion holding that the defense of "void ab initio " cannot defeat an incontestable trademark because it is not enumerated in 15 U.S.C. § 1064 as a basis for cancelling a trademark. NetJets Inc., v. IntelliJet Grp., LLC, 678 Fed.Appx. 343, 350 (6th Cir. 2017) (" Section 1064 bars IntelliJet Group from bringing a claim that NetJets's mark is void ab initio. "). In NetJets Inc., the Sixth Circuit distinguished the Eleventh Circuit's decision in Wilhelm Pudenz GmbH v. Littlefuse, Inc., 177 F.3d 1204 (11th Cir. 1999), which held that 15 U.S.C. § 1115(b) -the statute that enumerates defenses to an incontestable trademark-did not preclude all non-enumerated defenses to incontestable registrations. NetJets Inc., 678 Fed.Appx. at 349. The issue in Wilhelm Pudenz was whether the defense of functionality-which at that time was not an enumerated defense-could defeat an incontestable trademark. Wilhelm Pudenz, 177 F.3d at 1209. In finding that the defense of functionality was available, the Eleventh Circuit reasoned that "given the absence of any explicit reference to the functionality doctrine, which is a judicially created concept that predates the Lanham Act, we should be hesitant to read the [Lanham] Act as limiting the doctrine's reach."[30] Id. at 1210 ; see also id. at 1209 ("The Supreme Court [in Park 'N Fly, Inc. ] purposefully avoided holding that all non-enumerated defenses to incontestability were foreclosed, by declining to decide whether estoppel or laches (both non-enumerated defenses at that time) were available as defenses to an incontestable registration."). In light of this reasoning, it is possible that the defense of void ab initio is available as a defense to incontestable trademarks. But, as in NetJets Inc., Spiral Direct provides no "support for the contention that void ab initio challenges to registered marks predate the Lanham Act." NetJets Inc., 678 Fed.Appx. at 349.
Therefore, Spiral Direct's defense of void ab initio fails.
2. Likelihood of Confusion
Even though Basic's trademark registration is due to be cancelled, the question of whether there is a likelihood of confusion between the marks at issue will be addressed. In determining the likelihood of confusion, the Eleventh Circuit employs a multifactor test, weighing seven factors:
(1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's [goodwill]; and (7) the existence and extent of actual confusion in the consuming public.
Tana, 611 F.3d at 774-75.
As to the first factor-strength of the mark-it is undisputed that "Spiral" is an arbitrary mark because the name *1373 "Spiral" does not suggest the nature of Basic's goods. Arbitrary marks are considered strong, receiving the greatest scope of protection in trademark law. John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 974 (11th Cir. 1983) ("A purely fanciful or arbitrary mark is generally considered strong and is given protection over a wide range of related products and variations in appearance of the mark." (internal citation and quotation omitted) ); see Sovereign Military II, 809 F.3d at 1182 ("The stronger the mark, the greater the scope of protection accorded it, the weaker the mark, the less trademark protection it receives.") (internal quotation omitted) ). Additionally, in the Eleventh Circuit, incontestable trademarks are presumptively strong. Sovereign Military II, 809 F.3d at 1183 (noting that the Eleventh Circuit is an outlier in this respect).
Spiral Direct argues that even arbitrary marks may be relatively weak and entitled to only a narrow scope of protection where there is evidence of third-party use. Spiral Direct presented some evidence at trial that there are other companies that have incorporated some version of the word "spiral" into their trademark-"Spiral Salon," "Dragon Spiral," "Spiralogy," and "Downward Spiral and Design." (See Trial Tr. Vol. 4 at 117-18). However, Spiral Direct has failed to show that the Spiral mark was being used by third parties on similar goods or that those trademarks were actually in use and known to the consuming public. Palm Bay Imports, Inc., v. Veuve Clicquot Ponsardin Maison Fondee en 1772, 396 F.3d 1369, 1373 (Fed. Cir. 2005) ("Evidence of third-party use of similar marks on similar goods is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection." (emphasis added) ); id. ("The probative value of third-party trademarks depends entirely upon their usage.... While the Beverage Media Guide is compelling evidence that distributors were aware that the term VEUVE was used for other alcoholic products, it is not evidence that the consuming public was likewise aware."). Therefore, Spiral Direct's argument that the Basic Mark is entitled to only a narrow scope of protection fails.
As to the second factor-similarity of the marks-Spiral Direct's mark and the Basic Mark are identical in that they both use word "Spiral" for their respective clothing brands, though with a dissimilar graphical design. Additionally, the Court must give greater weight to the textual portion of the mark because it is the "component of brand names [that] likely will appear alone when used in text and will be spoken when requested by consumers." In re Viterra Inc., 671 F.3d 1358, 1366 (Fed. Cir. 2012).
With respect to the third factor-similarity between the goods offered-both Spiral Direct and Basic sell a variety of clothing with a sewn-in label depicting the word "Spiral." Of course, the appearance of each company's clothing varies, given that Spiral Direct produces "Goth" and "heavy metal" clothing while Basic produces outdoor and winter clothing. Some evidence at trial, however, showed that Spiral Direct sold garments that did not depict obvious "Goth" or "heavy metal" imagery but instead looked like ordinary black clothing. (Trial Tr. Vol. 1 at 130-35; see Ex. 37). In addition, Spiral Direct sold numerous fleece products-a mainstay of Basic's winter offerings. (Trial Tr. Vol. 1 at 131-32). Visually, the plain color and fleece garments were very similar to the type of garments sold by Basic.
As to the fourth factor-similarity of the sales methods and customer base-Spiral Direct sells its goods through print catalogs, on its website, and through third-party retailers like Ebay.com and Amazon.com. Basic currently sells its goods only on Overstock.com, though it previously sold its goods in numerous retail stores *1374 located in malls. Basic intends to expand its online sales to third-party websites likeAmazon.com. (Trial Tr. Vol. 4 at 159). Currently, no third-party online retailer carries both Basic's and Spiral Direct's products. (Trial Tr. Vol. 2 at 246). There was little evidence at trial regarding each company's customer base, but it is clear that Spiral Direct's customers are inclined to be enthusiasts of "Goth" or "hard rock" clothing while Basic's customers wear outdoor and athletic clothing.
Regarding the fifth factor-advertising methods-Spiral Direct advertises in "heavy metal" and "punk rock" magazines while Basic only hands out flyers. Basic argues, however, that confusion may occur when customers are shopping inside Basic's retail stores and then do comparison shopping on the Internet by searching "spiral" and "clothing" on search engines like Google.com. In fact, Dr. Frank's research indicated that all but one of the listings on the first page of Google's search results were for Spiral Direct's goods rather than Basic's goods. (Ex. 152; Trial Tr. Vol. 3 at 37-45). Dr. Frank further testified that 95% of customers stop their search after viewing the first page of search results. (Trial Tr. Vol. 3 at 45).
As to the sixth factor-intent to misappropriate goodwill-it is undisputed that Spiral Direct had no knowledge of Basic when it began using the SD Mark in the United States in 1993. And there was no evidence at trial of Spiral Direct attempting to misappropriate Basic's goodwill. Both sides agree, however, that Spiral Direct first learned of Basic's use of the mark in 2008 when the USPTO denied Spiral Direct a registration for the SD Mark in part because there was potential for confusion with the Basic Mark. (Ex. 168; Trial Tr. Vol. 1 at 139-40). But intent is measured from the time Spiral Direct adopted its mark, not from the time it learned of the Basic Mark. Hornady Mfg. Co. v. Doubletap, Inc., 746 F.3d 995, 1004 (10th Cir. 2014). Thus, there is no evidence that Spiral Direct intended to misappropriate Basic's goodwill.
Finally, with regard to the seventh factor-actual confusion-it is undisputed that there is no evidence of actual confusion.
Based on the foregoing, the Court concludes that there is a likelihood of customer confusion between the SD Mark and the Basic Mark. Use of the word "Spiral" as a trademark for the sale of clothing is presumptively strong. Additionally, Spiral Direct sells numerous fleece and plain-colored garments that could easily be mistaken for having been manufactured by Basic. And, although the parties use different graphical designs, a customer who conducts a Google search for clothing manufactured by Basic will likely be confused to find that nearly all of the search results are for Spiral Direct's clothing. Such confusion will likely be amplified if Basic expands its sales to large, third-party online retailers such as Amazon.com and Ebay.com, where Spiral Direct currently sells its goods. There is little doubt that two parties offering their goods for sale under the same trademark on the same website would result in some customer confusion.
3. Conclusion
Basic's mark is due to be cancelled, and Spiral Direct's defenses of abandonment, prior use, and void ab initio fail. Despite the likelihood of confusion, Basic's claims for infringement on its federally registered trademark fail due to its cancellation.
B. Common Law Trademark Infringement Claims
Both Spiral Direct and Basic allege common law trademark infringement claims under federal and state law.[31] As *1375 discussed above, to establish common law trademark infringement, a plaintiff must show "(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same or confusingly similar to its mark, such that consumers were likely to confuse the two." Tana, 611 F.3d at 773 (quoting Lone Star Steakhouse & Saloon, Inc., v. Longhorn Steaks, Inc., 106 F.3d 355, 358 (11th Cir. 1997) ). This Court has already found that there is a likelihood of confusion.
Basic may continue to have valid and enforceable trademark rights in the Basic Mark despite the cancellation of its federal registration. "All a finding of fraud does is knock out the mark's 'incontestable' status, and its registration, under [ 15 U.S.C.] § 1115(b)(1). It does not affect the mark's validity , because a trademark need not be registered to be enforceable." Specialized Seating, Inc., v. Greenwich Indus., L.P., 616 F.3d 722, 728 (7th Cir. 2010) (emphasis in original); see Morehouse Mfg. Corp. v. J. Strickland & Co., 407 F.2d 881, 888 (C.C.P.A. 1969) ("[T]he acquisition of the right to exclude others from the use of a trademark results from the fact of use and the common law, independently of registration in the Patent Office.... Assertions of 'fraud' should be dealt with realistically, comprehending, as the board did, that trademark rights, unlike patent rights, continue notwithstanding cancellation of those additional rights which the Patent Office is empowered by statute to grant."). Therefore, for either party to prevail on its claims of common law trademark infringement and unfair competition (Spiral Counts I, V, and VII; Basic Counts I and IV), it must show that its common law trademark rights are senior to the other's common law trademark rights. But neither Spiral Direct nor Basic has made any argument to that effect. Accordingly, neither Spiral Direct nor Basic has satisfied its burden of establishing trademark infringement and unfair competition.
Thus, despite the likelihood of confusion, neither Spiral Direct nor Basic demonstrated infringement of its common law trademark rights. Spiral Direct's claims of trademark infringement, including its claim for declaratory judgment of non-infringement (Counts I, V, and VII) fail, and Basic's claims for trademark infringement (Counts I and IV) fail. The Court must deny all relief sought by Basic and all relief sought by Spiral Direct[32] with the exception of cancelling Basic's registration of the Basic Mark.
*1376 C. Spiral Direct's FDUTPA Claim
Finally, Spiral Direct asserts a single claim under FDUTPA, Fla. Stat. § 501.204(1), based on Basic obtaining its registration of the Basic Mark through fraud on the USPTO. "A claim under FDUTPA has three elements: (1) a deceptive or unfair practice; (2) causation; and (3) actual damages." Siever v. BWGaskets, Inc., 669 F.Supp.2d 1286, 1292 (M.D. Fla. 2009). Spiral Direct's theory of causation is that it was unable to obtain a registration for its SD Mark because Basic fraudulently obtained a registration for the Basic Mark. While it is true that the USPTO denied Spiral Direct a registration for the SD Mark because of a likelihood of confusion with the Basic Mark, Spiral Direct failed to show that it has suffered actual damages. In a conclusory sentence in its memorandum, Spiral Direct states that Basic's fraud "is causing commercial injury to the value of its Spiral Marks and goodwill." (Doc. 146 at 28). But Spiral Direct has shown no evidence of any commercial injury, depreciation in its goodwill, or any negative changes in Spiral Direct's business after the USPTO denied its trademark registration in 2008. On the contrary, Shoaib testified that Spiral Direct simply continued to use the SD Mark after it received its rejection from the USPTO. (Trial Tr. Vol. 1 at 140-41). In fact, Spiral Direct increased its sales in the United States after 2008. (Id. at 143). Additionally, Spiral Direct is not seeking any monetary damages in this case, which is further indication that it has not suffered any actual damages. Accordingly, Spiral Direct has failed to establish its FDUTPA claim (Count VI).
D. Attorney's Fees
Spiral Direct and Basic each assert entitlement to attorney's fees under 15 U.S.C. § 1117(a), which provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The Clerk has not yet entered judgment in this case and thus the Court's consideration of the parties' entitlement to attorney's fees is premature. See Fed. R. Civ. P. 54(d)(2) ; M.D. Fla. Local R. 4.18. The parties may refile their motions for attorney's fees after judgment has been entered
IV. Conclusion
In accordance with the foregoing, it is ORDERED and ADJUDGED that:
1. Spiral Direct prevails on Count IV of the Amended Complaint (Doc. 16), which asserts that Basic's trademark is invalid based on fraud before the USPTO. Trademark No. 2,218,515 is CANCELLED. Pursuant to 15 U.S.C. § 1119, the Clerk is DIRECTED to notify the Director of the United States Patent and Trademark Office of the cancellation.
2. Spiral Direct does not prevail on any of its other claims.
3. Basic does not prevail on any of its counterclaims (Doc. 39).
4. The Clerk is directed to enter a judgment providing that Plaintiffs Spiral Direct, Inc. and Spiral Direct, Ltd., prevail on Count IV of the Amended Complaint, which sought a declaration of invalidity of Trademark No. 2,218,515; that Defendant Basic Sports Apparel, Inc., prevails on all other counts of the Amended Complaint; and that Spiral Direct, Inc. and Spiral Direct, Ltd., prevail on all of Basic Sports Apparel, Inc.'s counterclaims.
5. After entry of judgment, the Clerk shall close this case.
DONE and ORDERED in Orlando, Florida, on December 12, 2017.

The Ghayur brothers are referenced by their first names. Both Spiral UK and Spiral US are also managed by Shoaib's brother-in-law, M.N. Alam. (Trial Tr. Vol. 1 at 25-26). Spiral US is additionally managed by Omar Shafiq. (Id. at 27).

The trial transcript consists of four volumes-Docs. 136 (Vol. 1), 138 (Vol. 2), 140 (Vol. 3), and 142 (Vol. 4). The referenced exhibits were admitted jointly at trial. (Doc. 133 & Attachs.).

Exhibit references are to the trial exhibits which were admitted jointly.

Several years later, Spiral Direct used a mark that incorporated the same stylized text but with the addition of a dragon illustration. (Trial Tr. Vol. 1 at 28-29; see Ex. 1).

The USPTO received the application on September 17, 1997, but David's declaration, which was filed in support of the application, was signed on September 10, 1997. (Ex. 6 at 1).

The Court's admonition to David took place early in the second day of trial, near the start of Nadia's testimony. At the end of the day, the Court re-addressed the issue:
This morning I called Mr. David Chowaiki ... down.... I wasn't suggesting that he was trying to-that he was necessarily trying to do anything improper. I could see anybody in that situation whose mother is testifying just across from you, you know, encouraging or maybe answering for yourself. But I've got to be careful that it doesn't influence [the witness].
(Trial Tr. Vol. 2 at 268). The Court's statement at the end of the day was an effort to ease some embarrassment and tension in the courtroom and to reflect that there is a particular fragility to cases that involve close family members. The Court additionally stated: "[It's] an odd situation, as I said in the beginning, because we have two families here. So there are sensitivities that exist in that situation that don't exist in cases of this type ordinarily." (Id. ).
Recalling David's head gestures, and with the benefit of a transcript showing Nadia's rapidly changing testimony, it is clear that David's head gestures-whether intentional or not-had the effect of influencing Nadia's testimony. Accordingly, they cannot be ignored.

Nadia stated in part, "And I saw him buy, if I remember, he bought a hat. He bought-he bought a headband. Not a-two headbands I remember maybe, and he bought scarves because his son were [sic] going to Minneapolis to the university, he said, and it was cold." (Trial Tr. Vol. 2 at 51).

In assessing Nadia's credibility, the Court followed the credibility-assessment instruction it gives to juries, which includes consideration of these questions: "1. Did the witness impress you as one who was telling the truth? 2. Did the witness have any particular reason not to tell the truth? 3. Did the witness have a personal interest in the outcome of the case? 4. Did the witness seem to have a good memory? 5. Did the witness have the opportunity and ability to accurately observe the things he or she testified about? 6. Did the witness appear to understand the questions clearly and answer them directly? 7. Did the witness's testimony differ from other testimony or other evidence?" Eleventh Circuit Civil Pattern Jury Instruction 3.4 (2013).
Clearly, as an owner of Basic, Nadia has an interest in the outcome of the case. Additionally, Nadia acknowledged it was difficult for her to remember details, and her testimony regarding the sales was varied and self-contradictory.

Basic contends that the issue in Spira Footwear was "whether a slipper was considered a shoe," but it is clear from the district court's order that that was Spira Footwear's argument in the alternative. See Spira Footwear. Inc., v. Basic Sports Apparel, Inc., 545 F.Supp.2d 591, 594 (W.D. Tex. 2008) ("In the alternative, Spira contends that [Basic's] slipper does not fall within the definition of a shoe."). David even acknowledged in his testimony that he was aware that an issue in Spira Footwear was whether Basic sold slippers before filing the trademark application, (Trial Tr. Vol. 2 at 98; Trial Tr. Vol. 4 at 152-53), though he later changed his testimony and stated that the issue was about whether a slipper was a shoe, (Trial Tr. Vol. 4 at 159-60).

The Court takes judicial notice of Spira Footwear's motion for summary judgment and Basic's response in the Spira Footwear case in the Western District of Texas. Fed. R. Evid. 201(c)(1) (stating that a district court may take judicial notice on its own); Universal Express, Inc., v. SEC, 177 Fed.Appx. 52, 53 (11th Cir. 2006).

Based on David's declaration, the Spira Footwear court was led to believe that "[o]n June 15, 1997, [Basic] began selling its clothing line through retail stores under the brand name" and that "[Basic] operated its first store at 900 N. Michigan Avenue, Chicago Illinois, over a period of three and-a-half years." Spira Footwear, 545 F.Supp.2d at 592 & n.1.

The Court rejects Basic's contention that the Court may not consider Hilel's previous depositions because Spiral Direct did not properly impeach using the depositions at trial and they were not entered into evidence. (Doc. 150 at 8-9). As Basic notes, the deposition transcripts were "marked in the parties' joint exhibit list as for 'impeachment purposes.' " (Id. at 8). Regardless of whether Spiral Direct's counsel properly impeached Hilel with his prior inconsistent statements, Hilel was directly asked whether he stated in his previous depositions that Basic's only methods of advertising were "word of mouth and fl[y]ers," and Hilel responded "[t]hat is correct" and "it sounds about right." (Trial Tr. Vol. 4 at 107-08). Basic offers no argument as to why the Court cannot consider Hilel's inconsistent statements to the extent he agreed that they were inconsistent with his testimony at trial. (See id.).

The exemplars only had sewn-in labels with a "Polartec" mark, which is the brand name of the fabric. (Trial Tr. Vol. 2 at 33).

Nadia inconsistently testified about where she placed Spira and Spiral goods within the stores. She initially testified that she displayed Spira-branded goods in the front and left portions of the store and displayed Basic Goods on the right and back portions. (Trial Tr. Vol. 2 at 71-73). During Basic's case-in-chief, however, Nadia denied that Spira-branded clothing was placed in the front of the store and stated that Basic Goods were sold on the left side and Spira was sold on the right side. (Trial Tr. Vol. 3 at 123-24).

In 2014, Dr. Frank was retained by another company to investigate Basic regarding a different trademark infringement lawsuit. (Trial Tr. Vol. 2 at 212).

Basic's claims of trademark infringement are under 15 U.S.C. §§ 1125(a) & 1117, FDUTPA, and Florida common law. Each of these claims is analyzed under the same trademark infringement standard. Suntree Techs., Inc., v. Ecosense Int'l, Inc., 693 F.3d 1338, 1345 (11th Cir. 2012).

"Registration alone, by contrast, provides only 'prima facie evidence of ... validity.' " Sovereign Military II, 809 F.3d at 1183 (emphasis added) (alteration in original).

Spiral Direct asserts three bases for the Court to decline to consider Basic's evidence of making sales before September 17, 1997: (1) the doctrine of judicial estoppel, (2) because Basic failed to disclose that evidence in discovery, which Spiral Direct contends is a violation of Federal Rule of Civil Procedure 37(c)(1), and (3) the testimony is a "sham." Because the court is according no weight to the testimony of David, Hilel, or Nadia regarding sales that took place before September 17, 1997, the Court need not address these arguments.
Additionally, the Court need not separately address Basic's Rule 52(c) motion because its argument relied on the testimony of David and Nadia, which the Court has determined is not credible.

The court additionally noted that the agent in Nationstar (1) was the sole person involved in the business, (2) as a real estate agent knew the importance of verifying what he was signing, (3) was knowledgeable about the restrictions on his profession and the distinction between other industries such as real estate brokerage, (4) did not use the Nationstar mark on any business documents, invoices, or signs, (5) offered inconsistent and contradictory testimony regarding using the Nationstar mark on business cards and flyers, (6) did not file his application for the Nationstar mark until the opposing company contacted him about acquiring his Internet domain names, and (7) did not use his Nationstar domain names until two years after registering them. 2014 WL 6480655, at *14.

In addition to the Court's finding that David, Hilel, and Nadia lacked credibility in this case, Basic has twice been found by the Court to have engaged in improper conduct. First, based on Basic's conduct in a Chapter 11 reorganization in 2015 in which Basic did not disclose its claims against Spiral Direct as assets, Basic was judicially estopped from asserting those claims in this case. (See Order, Doc. 99). Also, Basic's expert on apparel was excluded as an expert due to extensive plagiarism in her expert report. (See Order, Doc. 122).

The only mention of partial abandonment in Spiral Direct's papers is in its Amended Complaint, which states that Basic abandoned the Basic Mark "in whole or in part." (Doc. 16 ¶ 55).

Cases decided by the United States Court of Appeals for the Fifth Circuit prior to October 1, 1981, are binding in this circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981).

"[E]ven a single use in trade may sustain trademark rights if followed by continuous commercial utilization." Blue Bell, 508 F.2d at 1265 ; see also Allard Enters., Inc. v. Advanced Programming Res., Inc., 146 F.3d 350, 358 (6th Cir. 1998) ("As long as there is a genuine use of the mark in commerce ... ownership may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition."); 2 McCarthy on _Trademarks and Unfair Competition § 16:6 (5th ed. 2017) ("[E]ven the most robust and strong mark may have been launched in the marketplace with a small number of sales or a modest level of pre-sales promotional advertising. If such small first steps are followed up with[in] a reasonable time by a continually increasing scale of sales, the first sales should be counted for purposes of establishing priority of use.").

See Inmuno Vital, Inc., v. Golden Sun, Inc., 49 F.Supp.2d 1344, 1353 (S.D. Fla. Dec. 3, 1997) (finding use of a trademark de minimis where, in over two years, a vitamin company sold 20 units in Illinois, 16 in New Jersey, 124 in Florida, and 648 in Texas, but finding that selling 1,564 units in Puerto Rico and 12,351 in California was sufficient); Sweetarts v. Sunline, Inc., 380 F.2d 923, 929 nn.2-3 (8th Cir. 1967) (finding that sales of candy totaling less than $75 were de minimis but finding an issue of material fact where annual sales of candy ranged from $1,000 to $20,000).

Some of the licensed goods and all of the third-party goods came with a sewn-in label displaying a third-party mark.

This confusion is compounded because all goods-whether third-party or under the SD Mark-came with an attached hangtag depicting the SD Mark. A "Simpsons" shirt that arrived with a hangtag depicting the SD Mark would reasonably lead a purchasing customer to believe that Spiral Direct was merely a company that re-sold third-party goods.

The Court found that Shoaib's estimates of Spiral Direct's revenue were not credible.

However, it is still unclear how many goods within the ninety percent would have arrived with a sewn-in label depicting the SD Mark because only shirts ordered in the black and natural colors had sewn-in labels with the SD Mark.

Spiral Direct did not plead "void ab initio" as a cause of action in its Amended Complaint or as a defense in its Answer; rather, during trial, Spiral Direct's counsel argued that the defense of void ab initio does not need to be pled in the Complaint. (Trial Tr. Vol. 3 at 92).

The Wilhelm Pudenz court further relied on the fact that in subsequent amendments to the Lanham Act, Congress explicitly added functionality as an enumerated defense under § 1115(b). Wilhelm Pudenz, 177 F.3d at 1208.

Spiral Direct's common law trademark infringement claims are under 15 U.S.C. § 1125 (Count V) and Florida common law (Count VII). Basic's common law trademark infringement claims are also under 15 U.S.C. § 1125 (Counterclaim I) and Florida common law (Counterclaim IV).

Spiral Direct seeks the following relief: "(a) finding it is the prior user and owner of the Spiral Mark in the US; (b) ordering the USPTO to immediately cancel the [Basic] Registration on the grounds of (i) fraud; (ii) 'void ab initio'; and/or (iii) abandonment; (c) ordering the USPTO to publish pending US Trademark Applications Ser. Nos. 86726692 and 86725156 in the name of Spiral Direct UK ("Spiral Applications") for opposition purposes; (d) enjoining [Basic], its principals, or anyone acting on their behalf, from filing and/or prosecuting any opposition or cancellation against the Spiral Application or any other trademark or service mark application filed by Spiral Direct which involves clothing, or otherwise objecting to the use or registration of any Spiral Direct use of SPIRAL as a trademark for any good or service involving clothing; [ (e) in the event this Court finds 'likelihood of confusion' in favor of Spiral Direct, that [Basic], its principals, or anyone acting on their behalf, be enjoined from any and all further use of the SPIRAL mark, or any mark substantially similar thereto, for clothing in the United States]; and (f) finding that this case is an 'exceptional' case for which Spiral Direct is entitled to its attorneys' fees and costs." (Doc. 146 at 30; Doc. 148 at 19 n.55 (adding "subsection (e)" to its previously requested relief) ).